# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3658

_____

| | | |
|---|---|---|
| Corey Wrenn, individually and as parent and next friend of S.W., a minor, | * * * * | |
| Appellant, | * * | Appeal from the United States |
| v. | * * | District Court for the Northern District of Iowa. |
| Principal Life Insurance Company; Principal Financial Group, Inc., | * * * | |
| Appellees. | * | |

_____

Submitted:  September 23, 2010
Filed:  March 2, 2011

_____

Before BYE, BEAM, and SMITH, Circuit Judges.

_____

BYE, Circuit Judge.

Corey Wrenn appeals an order granting judgment in favor of Principal Life Insurance Company and Principal Financial Group, Inc. (collectively Principal) on Wrenn's claim for medical benefits under a plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461. Reviewing the denial of benefits for an abuse of discretion, the district court upheld Principal's decision.  Wrenn contends the district court should have reviewed Principal's decision under a de novo standard because of procedural irregularities in

the handling of the claim; in the alternative, Wrenn argues Principal's denial was unreasonable and should be reversed even under the more deferential abuse-of-discretion standard. We agree with this latter argument, and therefore reverse.

I

On December 8, 2006, the Children's Hospital in Omaha, Nebraska, admitted S.W. under an emergency admission. She was fifteen years old at the time and weighed only seventy-seven pounds. At seventy-seven pounds, her body weight and mass were below the fifth percentile for her age. Lab work indicated she was suffering from severe malnutrition, revealing an abnormal EKG,[1] hypoglycemia,[2] and a low blood platelet count. Her low platelet count placed her at significant risk for a spontaneous hemorrhage or difficulty clotting if she were to suffer a fall. Because of her orthostatic[3] pulse while standing, she was placed on fall precautions, which included the use of a wheelchair and supervised bathroom privileges.

The focus of her hospitalization was her calorie intake and limitations on her physical activity in order to increase her body weight. The goal was for her to obtain a body weight of at least eighty-nine pounds before discharge would be considered, with an overall target weight of 105 pounds. In order to assess the progress in her physical condition, her doctor ordered that she be weighed daily each morning. Her input (caloric intake) and output (body waste) were compared initially to measure progress.

---

[1]Electrocardiogram.

[2]Below normal blood sugar levels.

[3]Orthostatic hypotension describes a condition in which a person's blood pressure drops dramatically when the person stands up.

At the beginning of her hospitalization, S.W. was placed on a regular diet of 800 calories per day with Gatorade four times a day. Her caloric intake was gradually increased from 800 calories per day to 3,400 calories per day. Nutrition Data Progress Sheets were filled out weekly to track her treatment progress. Initially, she was not allowed to exercise. Her level of exercise gradually increased from none, to stretching only, to being permitted to engage in aerobic exercise. Because of her poor physical condition, she was prescribed a special mattress to prevent skin breakdown, as well as several medications, creams and vitamins. She had continued problems with stools and bloating while her dietary issues and low body weight were being addressed.

Eleven days after her admission, S.W.'s physical condition had finally improved enough that she was removed from wheelchair precautions, but she remained on fall precautions. The daily progress notes prepared by S.W.'s treating physician, Dr. Martin Harrington, consistently listed hypotension, orthostatic pulse, and bradycardia[4] as S.W.'s chief problems. Fourteen days after S.W.'s hospitalization, the daily progress note prepared by Dr. Harrington states: "Continue inpt tx [inpatient treatment] as body/vital signs [are] slowly healing from malnutrition." Nineteen days after her admission, the section of the daily progress notes listing the patient's subjective state of mind reflects S.W.'s understanding that her hospitalization was related to her physical condition: "Since my vitals are getting better, will that shorten my stay?"

By January 2, 2007, twenty-five days after her admission, S.W. had gained a little over eight pounds, increasing her weight to 85.2 pounds. On January 8, 2007, a full month after her initial admission, S.W.'s lab work was finally within normal limits and she had reached a body weight of eighty-seven pounds, ten pounds more than when she was admitted. On January 12, the Children's Hospital expected S.W.'s weight to be stabilized by January 18, 2007, at which time it was deemed safe to

---

[4]Bradycardia is an abnormally low heart rate.

consider transferring her to outpatient care. She was finally discharged from the hospital on January 17, 2007, forty days after her initial admission. The next day, S.W. began treatment in the Children's Hospital's partial hospital program (PHP) for eating disorders. At the time of her admission into the outpatient program, S.W.'s body weight had reached 91.8 pounds, just above the eighty-nine pound goal set for her discharge from full hospitalization.

S.W. was covered under a group health insurance policy issued to her father, Corey Wrenn, through his employer. The policy was issued by Principal and is governed by ERISA. Principal is both the insurer and the claims administrator.

Provisions in the policy limit the benefits available for "Mental Health, Behavioral, Alcohol or Drug Abuse Treatment Services."[5] Most notably, the policy had a limit of "not more than 10 days of inpatient services each calendar year for each insured person" for mental health, behavioral, alcohol or drug abuse treatment services. In addition, the policy provided that "[i]n the event the Member or Dependent receives Treatment or Services from more than one condition during the same period of time, benefits will be paid based on the *primary focus* of the Treatment or Service, as determined by The Principal." Appellant's App. at 13 (emphasis added).

---

[5]The policy defines "Mental Health, Behavioral, Alcohol or Drug Abuse Treatment Services" as follows:

> Treatment or Service provided to alter a person's behavior, regardless of the cause of that behavior, including but not limited to: individual, family or group psychotherapy; psychological testing; electroconvulsive therapy; psychiatric diagnostic interview or examination; behavior modification; psychiatric, alcohol or drug abuse medication management; biofeedback; alcohol or drug abuse rehabilitation or counseling services; hypnotherapy; narcosynthesis; milieu or other therapies (physical, occupational, or speech therapy) used to diagnose or treat mental health, behavioral, alcohol or drug abuse problems.

Relying upon the policy's ten-day limit for mental health inpatient services, Principal paid benefits for ten days of S.W.'s hospitalization in the 2006 calendar year, and the first ten days of her hospitalization in the 2007 calendar year, but denied payment of hospitalization benefits beyond that time on the ground that the "primary focus" of S.W.'s hospitalization was mental health treatment. The hospital charges Principal refused to pay totaled $44,260.63.

Wrenn filed an administrative appeal of Principal's denial. Principal denied the appeal. Wrenn was entitled to a second level of appeal, referred to as a voluntary appeal, and he filed one of those as well. Principal again denied the claim.

On February 7, 2008, Wrenn filed a complaint in federal district court challenging Principal's denial of the claim. Principal performed a supplemental review after litigation commenced pursuant to an agreement between the parties. During the supplemental review, Principal received a report from a psychiatrist it asked to examine the file. The psychiatrist's report found that S.W.'s hospitalization was medically necessary (i.e., "does meet General medical necessity criteria for treatment at the acute inpatient eating disorder level"), for the first twenty-one days of hospitalization from December 8, 2006, through December 29, 2006. Nonetheless, Principal again denied Wrenn's claim by letter dated January 9, 2009.

After the supplemental review failed to resolve the dispute, the parties submitted the matter to the district court on the record and on briefs. Noting the policy granted Principal discretionary authority to determine eligibility for benefits, the district court reviewed Principal's decision under an abuse of discretion standard, considering as a factor Principal's conflict as both insurer and plan administrator. See Metro. Life Ins. Co. of Am. v. Glenn, 554 U.S. 105, 115-19 (2008) (clarifying the standard of review that should apply to a conflicted plan administrator). In applying a straight abuse-of-discretion review, the district court rejected Wrenn's claim that procedural irregularities in the manner in which Principal handled the claim triggered

a less deferential standard of review under the sliding scale approach set forth by the Eighth Circuit in Woo v. Deluxe Corp., 144 F.3d 1157, 1161 (8th Cir. 1998).

Under an abuse-of-discretion standard, the district court determined Principal's denial of the claim was reasonable. In relevant part, the district court stated:

> The mere fact that Principal arguably *could* have reached a determination that S.W.'s malnourishment and physical condition were the primary focus of her hospitalization simply cannot change the fact that Principal's actual decision, that S.W.'s mental health condition was the primary focus of her care, was a reasonable one supported by substantial evidence in the record.

Addendum at 21.

Wrenn filed a timely appeal. On appeal, Wrenn argues the district court erred in applying an abuse-of-discretion standard of review because of procedural irregularities in Principal's handling of his claim. Wrenn alternatively argues Principal abused its discretion in denying his claim.

## II

In an ERISA case such as this, we apply de novo review both to the district court's determination of the appropriate standard of review, as well as to the plan administrator's decision to deny benefits. See Tillery v. Hoffman Enclosures, Inc., 280 F.3d 1192, 1196 (8th Cir. 2002) (addressing our review of the standard of review in an ERISA case); Manning v. Am. Republic Ins. Co., 604 F.3d 1030, 1038 (8th Cir. 2010) (addressing our review of the plan administrator's decision).

Wrenn first argues that procedural irregularities in the manner in which Principal handled this claim should have triggered a standard of review less

deferential than abuse of discretion under the sliding scale approach adopted in Woo, 144 F.3d at 1160.[6] We find it unnecessary to resolve this issue, as we conclude Principal's decision cannot stand even when reviewed for abuse of discretion.

In evaluating Principal's denial of benefits "[u]nder the abuse of discretion standard, the proper inquiry is whether [Principal's] decision was reasonable; *i.e.*, supported by substantial evidence." Fletcher-Merrit v. NorAm Energy Corp., 250 F.3d 1174, 1179 (8th Cir. 2001) (internal quotation marks and citation omitted). Thus, in order for Principal to reasonably deny S.W.'s hospital charges, substantial evidence had to support its determination that the primary focus of her hospitalization was mental health treatment, i.e., treatment designed to alter her behavior. While there is certainly evidence that mental health treatment was *one* focus of S.W.'s hospitalization, we conclude there is insufficient evidence to support the determination that S.W.'s mental health was the *primary* focus of the hospitalization.

---

[6]Woo held a less deferential standard of review than abuse of discretion applied whenever "(1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty[.]" Woo, 144 F.3d at 1160. After the Supreme Court's decision in Glenn, the Woo sliding-scale approach is no longer triggered by a conflict of interest, because the Supreme Court clarified that a conflict is simply one of several factors considered under the abuse of discretion standard. The *procedural irregularity* component of the Woo sliding scale approach may, however, still apply in our circuit post-Glenn. See Wakkinen v. UNUM Life Ins. Co. of Am., 531 F.3d 575, 582 (8th Cir. 2008) (stating "[w]e continue to examine [a procedural irregularity] claim under Woo"); but see Chronister v. Unum Life Ins. Co. of Am., 563 F.3d 773, 776 (8th Cir. 2009) (analyzing a procedural irregularity, i.e., a plan administrator's failure to follow its own claims-handling procedures, as one factor under Glenn's abuse of discretion standard). Because we conclude Principal abused its discretion, we do not address the extent to which Glenn may have changed the procedural irregularity component of Woo's sliding-scale approach.

First, it is clear S.W.'s severe malnutrition, a physical condition, was the reason for her admission to the hospital. Her physical health was unstable as shown by a number of objective criteria. The lack of proper nutrition had caused an orthostatic pulse, an abnormal EKG, hypoglycemia, and a low blood platelet count. Her unstable condition could have resulted in additional physical injury in an outpatient setting, because her low platelet count placed her at significant risk for a spontaneous hemorrhage or difficulty clotting if she suffered a fall. The hospital setting allowed her doctors to require her to use a wheelchair and to monitor her use of the bathroom in order to prevent a fall. S.W.'s malnutrition had also compromised the integrity of her skin, and the hospital setting allowed the use of a special mattress to prevent skin breakdown. Finally, the hospital setting allowed S.W.'s caloric intake and exercise to be closely monitored in order to stabilize her weight, lab work, and vital signs. All of this evidence indicates the primary focus of the hospitalization itself was S.W.'s physical health.

Second, to the extent the treating physician's subjective intent in treating S.W. can be gleaned from the medical records, the records indicate his primary focus was on S.W.'s physical health, rather than her mental health. The daily progress notes consistently list S.W.'s chief problems as physical conditions (i.e., hypotension, orthostatic pulse, and bradycardia) rather than mental conditions. Similarly, S.W.'s continued admission to the hospital was tied to her physical health rather than her mental health. One of Dr. Harrington's progress notes specifically states "[c]ontinue inpt tx as body/vital signs [are] slowly healing from malnutrition." The medical records also reflect S.W.'s understanding that her continued admission to the hospital was related to her physical health rather than her mental health, when she asked whether the improvement in her vital signs would shorten her stay. All of this evidence points to S.W.'s physical health as being the primary reason for the hospitalization.

Third, the record indicates the criteria for discharging S.W. were always directly tied to her physical health, rather than her mental health. The only discharge goal ever discussed in the record was for S.W. to reach a stable body weight of eighty-nine pounds before the Children's Hospital would consider discharging her to an outpatient treatment program. Significantly, the record shows a correlation between the body weight goal of eighty-nine pounds and the stabilization of S.W.'s lab work and vital signs. The Children's Hospital could have obtained its discharge goal – increasing S.W.'s body weight – with treatment modalities focusing solely on her physical health (caloric intake and regulation of her physical activities) without ever addressing the mental aspects of her condition. This evidence strongly indicates the primary focus of the hospitalization was S.W.'s physical health.

Fourth, although S.W. received mental health treatment while she was hospitalized, the record lacks any evidence indicating the hospitalization was *necessary* to the mental health treatment. In other words, there is no evidence indicating S.W.'s mental health treatment could not, or would not, have been provided on an outpatient basis but for the fact S.W.'s poor physical health required hospitalization. During oral argument, Principal contended the primary focus of S.W.'s hospitalization was mental health treatment because the medical records "show that there is no difference in the [mental health] treatment being provided. She was doing exactly the same things, going to the same classes, having the same therapy, by the same psychiatric practitioners, both nurse and physician, during inpatient and outpatient. The only difference is they were four hours a day instead of all day long." Thus, Principal concedes there was no substantive change to S.W.'s mental health treatment after she was discharged from the hospital.

Rather than proving S.W.'s mental health was the primary focus of her hospitalization, we believe the substantive similarity in mental health services provided to S.W. during both her inpatient and outpatient periods of care proves just the opposite. Evidence that the mental health professionals could, and did, provide

S.W. the exact same services whether she was hospitalized or not reasonably leads us to conclude the reason for the hospitalization was something other than the provision of mental health services.

Fifth, the record lacks any evidence indicating S.W.'s discharge from the hospital was connected to, or dependent upon, progress made in the treatment of her mental health. While there is clear evidence connecting the discharge decision to an objective measure of S.W.'s physical health (her body weight), Principal points to no evidence in the record (and we could find none) indicating the discharge decision was related to some objective measure of the progress in addressing the psychological components of S.W.'s illness. It does not appear the Children's Hospital was primarily concerned with altering S.W.'s behavior (the hallmark of Principal's definition of mental health treatment) before it would consider discharging her.

For example, the record reflects that S.W.'s condition of anorexia nervosa primarily manifested itself in two ways – a difficulty controlling the urge to restrict food intake and a difficulty controlling the urge to exercise. The record contains "Daily Safety Contracts" which required S.W. to rank the severity of her obsessive thoughts, thoughts of suicide, anger, urges to restrict food intake, to exercise, to purge, to binge, etc. The severity of the urges were listed on a scale of one to ten, with one corresponding to "NEVER" and ten corresponding to "ALWAYS." Throughout her hospitalization, S.W. consistently ranked the urges to restrict food intake and the urge to exercise higher than the other categories. The daily contracts show S.W. made little progress in controlling her urges to restrict food intake and to exercise during her hospitalization, ranking both urges at a high of "6" on the day after her admission, and still as high as "4" on January 3, 2007 (whereas she consistently ranked all other categories at or near zero). Indeed, while the record shows S.W. made some progress in those two areas of her mental health between December 10 and December 25, she actually appears to have regressed between December 25 and January 14, four days before her discharge.

If the primary focus of S.W.'s hospitalization was her treatment for mental health, we would expect to find some evidence connecting her discharge goal to progress in affecting a change in her mental health, i.e., controlling her urges to restrict food intake or to exercise. There is, however, no evidence of that sort in the record. Thus, even assuming that S.W. made progress in some aspects of her mental health during her hospitalization, the absence of any evidence connecting such progress to the decision to discharge her clearly indicates mental health was not the primary focus of the hospitalization itself.

### III

The presence of evidence directly connecting S.W.'s initial and continued admission and her discharge to objective measurements of her physical health, coupled with the absence of evidence connecting S.W.'s discharge decision to improvements in her mental health, clearly indicate Principal unreasonably concluded the primary focus of S.W.'s hospitalization was treatment for mental health. We therefore reverse and remand with directions to enter judgment in Wrenn's favor.

_____