# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 11-3711

———————————————

Erin S. Govrik, Personal Representative of the Estate of Kevin Sullivan,

*Plaintiff - Appellee,*

v.

Unum Life Insurance Company of America; Unum Group,

*Defendants - Appellants.*

——————————

Appeal from United States District Court
for the District of Minnesota - Minneapolis

——————————

Submitted: June 15, 2012
Filed: January 10, 2013

——————————

Before MURPHY, BRIGHT, and COLLOTON, Circuit Judges.

——————————

COLLOTON, Circuit Judge.

This appeal arises from a dispute between Unum Life Insurance Company of America ("Unum") and the late Kevin Sullivan over long-term disability benefit payments. After paying benefits to Sullivan for several years, Unum discontinued the payments in January 2010. Sullivan sued Unum, arguing that the termination of his benefits violated the Employee Retirement Income Security Act of 1974 ("ERISA"),

29 U.S.C. §§ 1001–1461 (2010), and Unum counterclaimed for overpayment of benefits. The district court granted summary judgment in favor of Sullivan and granted Sullivan's subsequent motion for attorneys' fees. Unum appeals. We reverse the district court's grant of summary judgment and award of attorney's fees, and remand for consideration of Unum's counterclaims.

I.

Sullivan was injured in a diving accident in 1984 and became a partial quadriplegic. In 1991, he founded In Home Personal Care, Inc. ("IHPC"), a company that provided home health care services. At first, Sullivan was the sole shareholder in the company, but his shares were transferred to his sister and then in 1996 to a Supplemental Needs Trust established under Minnesota law to provide for Sullivan's needs. Sullivan served as president of the company until he died during the pendency of this litigation on June 14, 2011. Sullivan also owned a subsidiary corporation called In Home Personal Care Home Health, Inc.

In 2000, Sullivan sold his interest in the subsidiary corporation to IHPC for $440,000. IHPC paid Sullivan with a promissory note with terms that included a minimum payment of "$5,000.00 on monthly or yearly intervals" and a method for calculating the interest rate.

In 2004, IHPC purchased a group long-term disability policy from Unum. The policy covered Sullivan, as president, for two-thirds of his monthly salary up to $10,000. The $10,000 maximum monthly payment was subject to several offsets, including disability payments from the Social Security Administration ("SSA").

Under the Unum disability policy, the payments to which a claimant is entitled depend in part on the claimant's monthly earnings before he is disabled. The time frame to calculate a claimant's earnings under the policy depends on whether his

income came in the form of a commission or a bonus. If the income were commissions, the earnings calculation would include "the 12 full calendar month period . . . just prior to the date your disability begins." For bonus payments, the calculation included "the prior calendar year's 12 month period . . . just prior to the date your disability begins." In other words, the policy would consider *commission* payments received over a 12-month period from just before the disability claim, and the policy would consider *bonus* payments received in the prior calendar year—January to December.

On October 3, 2005, Sullivan reduced his work hours due to worsening medical conditions. In March 2006, he filed a claim for long-term disability under IHPC's policy with Unum. As part of the claim, IHPC's accountant, Michael Holmquist, provided ledgers documenting Sullivan's compensation from 2004 through 2006. For 2004, the records show Sullivan received six payments of $740 and two larger payments—$150,000 and $25,000—which were listed as "[f]or prior services." Sullivan received the $150,000 payment on September 30, 2004, and the $25,000 payment on December 31, 2004. In 2005, Sullivan received six payments of $720 to $780 and a payment of $50,000 on December 30. The $25,000 payment at the end of 2004 falls within one year of the disability occurring on October 3, 2005.

Unum sent Holmquist a list of questions, including whether Sullivan's officer salary was "inclusive of a bonus or a commission, or both." Holmquist's response was inconclusive:

> [Sullivan]'s officer salary is inclusive of a commission. The commission could be called a bonus, depending on the definition used. This commission paid has been approximately 6% of annual company revenue. Company policy is to pay [Sullivan] a commission based on both that guideline and his work performance, and the timing of payment is based on company cash position and liquidity needs.

Unum also asked how much was a bonus and how much was commission, to which Holmquist answered: "It is all commission, unless definitions would deem part of it bonus. In any event, it is based on the 6% guideline."

In August 2006, Unum approved Sullivan's benefit claim. Unum also determined that the large payments were commissions for purposes of the policy. In making an earnings calculation, therefore, Unum considered only those large payments Sullivan received from October 1, 2004, to September 30, 2005, and excluded the $150,000 payment made on September 30, 2004. When totaling the amounts, however, a representative of Unum mistakenly recorded the $25,000 payment from December 31, 2004, as $250,000. As a result, Unum paid Sullivan the maximum possible monthly benefit under the policy (offset by Sullivan's SSA disability payments).

Sullivan also received disability payments from the SSA, beginning in approximately 1999. In April 2007, however, the SSA informed Sullivan that the benefits should have ceased in December 2001, and that he would be required to repay $163,794 in benefits received thereafter. After receiving further information from Sullivan, the SSA reinstated his disability payments dating back to when Sullivan reduced his work hours in October 2005. But Sullivan still owed the SSA over $120,000. To collect that amount, the SSA declared that it would retain Sullivan's monthly benefit payments until the agency was reimbursed for the overpayment.

In December 2008, Sullivan challenged the SSA's decision by submitting a request for reconsideration. In his request for reconsideration, Sullivan declared under penalty of perjury that he had sold In Home Personal Care Home Health, Inc. to IHPC in 2000 for $440,000, and that "[a]ccording to the Social Security Administration, the sale of a business is not considered earned income." Sullivan also declared that at the time of the sale, IHPC and Sullivan "were given incorrect

financial advice . . . . to pay [Sullivan] as W-2 wages instead of as proceeds from the sale of a business." Sullivan asserted that his "monthly salaries were between $720 and $800," and that he was thus allowed "to continue receiving [SSA disability] payments." Sullivan also submitted an amortization schedule for IHPC's promissory note for the sale of the business. This schedule set forth the accrued interest each year and called for payments from IHPC to Sullivan of $350,000, $175,000, and $50,000, on the last day of the year in 2003, 2004, and 2005, respectively.

After the SSA suspended Sullivan's disability benefits, Sullivan notified Unum of the change. The new information raised questions at Unum regarding its own benefit payments to Sullivan and prompted a review of Sullivan's file. In the review, Unum discovered its initial accounting error, removed the erroneous zero from the $250,000 entry, and recalculated Sullivan's benefits using the actual payment of $25,000. The correction dramatically reduced Sullivan's benefit payments.

Unum also had several other questions about Sullivan's situation and sent a field representative to interview Sullivan, with his attorney, in February 2009. During the interview, Sullivan discussed the sale of his subsidiary business to IHPC and noted that IHPC still owed him $36,064 from the sale, to be paid out over the next ten years. Sullivan also indicated that the large increase in his income in 2003 was partly based on payments by IHPC from the sale of the business. The field representative also attempted to interview Holmquist, but Holmquist stopped serving as IHPC's accountant at the end of 2004 and referred any questions to the new accountant.

In April 2009, Unum reduced Sullivan's benefit payment based on the corrected clerical error and asked several more questions about his finances. In October 2009, Sullivan, through an attorney, contested Unum's benefit calculation, arguing the large payments were not commissions, but were either salary or bonuses. Classifying the large payments as salary or bonuses would change the time frame

used to calculate the benefits, so that it would include the $150,000 payment that Sullivan received one year and three days before he reduced his work hours. Sullivan also provided Unum with various documents, including personal and corporate tax returns, and Sullivan's request for reconsideration with the SSA. Sullivan's counsel stated that "Sullivan intends to notify Social Security that he is dropping his request for reconsideration," and asserted that the large payments were salary, not income from the sale of a business.

After further review, Unum concluded in January 2010 that the large payments in 2004 were for the sale of a business to IHPC, and that those payments thus could not be included in the calculation of Sullivan's pre-disability earnings. Unum explained:

> The information provided to the SSA in December of 2008, signed under penalty of perjury, was supported by documentation contemporaneous to the 2000 sale of a business referenced above. Therefore, we are giving more significant weight to the information Mr. Sullivan provided to the SSA than to documents prepared in 2006 and later documents in response to Unum's inquiries.

Once the large payments were removed from the calculation of pre-disability income, Unum determined that Sullivan's pre- and post-disability income from IHPC was roughly the same. Therefore, in January 2010, Unum discontinued the payment of disability benefits to Sullivan.

Sullivan appealed Unum's decision. He argued, among other things, that his request for reconsideration to the SSA "did not say that the payments were in fact for the sale of the subsidiary," but argued only that "it could have been, because in fact he was owed that money." Sullivan claimed that the information he provided to the SSA stated that the 2004 income was paid as wages. Sullivan included a letter from his current accountant regarding the sale of the business to IHPC. The letter stated

that "[p]rior to 2008 it is our understanding that no payments were made by IHPC to Kevin Sullivan." The accountant explained that "[w]e, therefore, in 2008 determined that annual payments should be made over five years to pay off this debt."

Unum reviewed the information submitted with Sullivan's appeal and affirmed its earlier decision. The decision letter on the appeal explained as follows:

> Given that the various financial documents that have been submitted contradict one another, Unum must determine which document to rely on and that analysis consisted of identifying those documents that are the most accurate and objective. Therefore, the second financial review concurred with the prior review that the sworn statements to the SSA seem to be the most accurate and objective. These statements were made under penalty of perjury and are also supported by a notarized promissory note dated January 3, 2000, which is well before the adverse decision by the SSA or the filing of the Unum claim, and a supporting amortization schedule showing the 2004 payments.
>
> In your appeal letter, you state that your client did not say to the SSA that amounts paid to him were for the sale of the subsidiary company to the employer. You state that he said they "could have been" payments on that note. You also assert that since the payments were characterized as wages, Unum is obligated to view them as such. We were unable to identify any caveat to the statement that your client made to the SSA. His statement specifically says that the employer incorrectly reported the proceeds of the sale as W2 wages and attached an amortization schedule to show that the payments were not wages. The amortization schedule characterizes them as payments on the promissory note.
>
> Therefore, the lump sum payments are not considered as part of your client's pre-disability monthly earnings as defined by the policy.

**Our Response to Your Concerns:**

You have stated that your client cannot change the characterization of the aforementioned payments because the time has passed for him to file an amended tax return, and you have also stated that Unum is placing too much reliance on the SSA documentation. Given the inconsistencies and contradictions in the financial information, the SSA documentation appears to be the most objective and therefore, the one relied upon by our financial department in their analysis. In that sworn documentation, your client stated that the payments were not wages. Therefore, the lump sum payments would not be considered in the calculation of Mr. Sullivan's basic monthly earnings.

Sullivan sued Unum in the district court seeking the reinstatement of his benefits. Unum counterclaimed seeking recovery of all benefits it paid to Sullivan. On cross-motions for summary judgment, the district court granted summary judgment in favor of Sullivan, and ultimately awarded him retroactive benefits from March 2009 to June 14, 2011. The court reasoned that because Sullivan had informed Unum that he intended to withdraw his request for reconsideration before the SSA, it was unreasonable for Unum to rely on that submission "when the remainder of the record before it clearly demonstrated that the 2004 lump sum payments were considered by [Sullivan] and IHPC as wages." The district court further concluded that the lump sum payments were properly considered bonuses rather than commissions. Sullivan then moved to recover litigation expenses and reasonable attorneys' fees pursuant to 29 U.S.C. § 1132(g). The district court granted the motion, and awarded Sullivan $81,770.52 in attorneys' fees and costs. Unum appeals both decisions.

II.

Under ERISA, a plan beneficiary may bring a civil action to obtain judicial review of a benefits determination. 29 U.S.C. § 1132(a)(1)(B). Where, as here, the language of an ERISA plan provides the administrator discretionary power to construe ambiguous terms or make eligibility determinations, the administrator's decisions are reviewed for an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989); *King v. Hartford Life and Acc. Ins. Co.*, 414 F.3d 994, 998–99 (8th Cir. 2005) (en banc). "This highly deferential standard reflects the fact that courts are hesitant to interfere with the administration of [an ERISA] plan." *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 952 (8th Cir. 2010) (internal quotation omitted). Under an abuse of discretion standard, the administrator's decision "will not be disturbed if reasonable." *Bruch*, 489 U.S. at 111. "We measure reasonableness by whether substantial evidence exists to support the decision, meaning more than a scintilla but less than a preponderance." *Wakkinen v. Unum Life Ins. Co. of Am.*, 531 F.3d 575, 583 (8th Cir. 2008) (internal quotation omitted). We review the district court's decision on summary judgment *de novo*.

In determining whether the plan administrator abused its discretion, we must also consider the inherent conflict of interest that arises when a plan administrator acts as both the payer of benefits and the decision-maker in a claim determination. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). This conflict of interest does not change the standard of review, and should be weighed only as a factor in determining whether the administrator abused its discretion. *Id.* at 115–17. A conflict of interest should be given greater weight "where circumstances suggest a higher likelihood that it affected the benefits decision." *Id.* at 117.

In this case, Unum is both the decision-maker on the claim and the payer of benefits. Sullivan contends that the conflict of interest should be given significant

weight. He argues that by February 2009, Unum was motivated by a reasonable prospect of litigation and was considering litigation strategy when it sought additional information from Sullivan. He further asserts that Unum provided the claim file only after repeated requests from Sullivan and his attorney, and that Unum performed a biased financial review.

The record shows the initial reduction of Sullivan's benefits resulted from Unum's correction of its initial clerical error. In recalculating Sullivan's benefits, the company continued to treat the large payments as a commission—the same method Unum used initially, without objection, in 2006. Unum also provided a multi-tiered review of Sullivan's disability claim, provided multiple opportunities for Sullivan to clarify the situation, and consistently informed him of the specific information needed to support his claim. Sullivan has not presented evidence that the three-month delay in providing the claim file prejudiced him. Consistent with *Glenn*, we consider the conflict of interest as a factor, but we decline to give it the substantial weight requested by Sullivan.

On the merits of Unum's decision, we conclude that it was not an abuse of discretion for the administrator to determine that the large payments totaling $175,000 that Sullivan received in 2004 were payments for the sale of a business. It was reasonable for Unum to rely on the information that Sullivan provided to the SSA, rather than Sullivan's latter-day claim to Unum that the large payments were monthly earnings (*i.e.*, salary or bonuses). Sullivan represented to the SSA that he sold a home healthcare company to IHPC in 2000 for $440,000, and that IHPC was to make payments "as specified in the Promissory Note." Sullivan explained that he and IHPC were given "incorrect financial advice" to pay Sullivan "as W-2 wages instead of as proceeds from the sale of a business." He argued that because "income from the sale of a business is not considered earned income," his monthly salary of $720 to $800 allowed him to continue receiving Social Security disability benefits.

Sullivan's declaration was corroborated by documentary evidence. He attached a promissory note executed in 2000 in which IHPC promised to pay Sullivan $440,000. He presented an amortization schedule, entitled "In Home Personal Care's Promissory Note Amortization Schedule to Kevin Sullivan," that showed scheduled payments on the note. The schedule called for a payment of $175,000 to Sullivan on December 31, 2004. The company's "salary" records show payments for the same amount of $175,000 in late 2004, albeit divided into payments of $150,000 on September 30, 2004, and $25,000 on December 31, 2004. Records concerning payments in 2005 further corroborated Sullivan's representation to the SSA. The amortization schedule called for a payment of $50,000 on December 31, 2005, while the company's "salary" records show a corresponding payment of $50,000 on December 30, 2005. The minor discrepancies between the amortization schedule and the actual disbursements do not make it unreasonable for Unum to conclude that the payments in 2004 were what Sullivan said they were—proceeds from the sale of a business.

Sullivan's representative argues that it was unreasonable for Unum to rely on Sullivan's submissions to the SSA, because Sullivan withdrew his administrative appeal and the SSA never relied on the representations. It is true that Sullivan's attorney sent a letter to Unum in October 2009, stating that Sullivan "intends to notify Social Security that he is dropping his request for reconsideration." But as of the time when Unum terminated Sullivan's benefits in January 2010, and upheld that decision on administrative appeal on July 1, 2010, Sullivan had furnished no proof that his request to the SSA had been withdrawn. Not until July 7, 2010, *after* Unum had resolved Sullivan's administrative appeal and denied benefits, did Sullivan's counsel notify Unum that Sullivan had "now reached an agreement with the [SSA] on repayment of the overpayment."

Given Sullivan's shifting positions on how his income should be characterized, it was not unreasonable to hold Sullivan to his formal declaration. Sullivan's

representative now claims that Sullivan's position on the request for reconsideration with the SSA was "not supportable," and that the SSA documents are "not reliable evidence, because they were prepared for the purpose of Sullivan avoiding the large SSA overpayment." *Id.* at 32. But Sullivan's submissions to Unum were prepared, of course, with a comparable motive to receive a large amount of long-term disability benefits, and there is no reason to consider them inherently reliable.

Sullivan's representative points to evidence that the company treated the large payments to Sullivan as compensation for his work. This evidence includes IHPC's corporate tax return for 2004, which listed $179,410 as compensation of officers, Sullivan's IRS Form W-2 for 2004, which listed the same amount as wages, and IHPC's internal accounting records, which listed the payments of $175,000 as "salary." But a plan administrator does not abuse its discretion "merely because there was evidence before it that would have supported an opposite decision." *Bolling v. Eli Lilly & Co.*, 990 F.2d 1028, 1030-31 (8th Cir. 1993). Sullivan explained under penalty of perjury, moreover, that the payments were characterized as wages only because he received "incorrect financial advice."

To accept Sullivan's revised position that the payments were salary or bonuses, the administrator would have to believe that Sullivan received *nothing* for his sale of the business to IHPC until 2008. This despite an amortization schedule calling for payments of $225,000 on a promissory note during the same time frames in which he received three large payments totaling $225,000 in 2004 and 2005. And this despite a promissory note dated January 2000 that required IHPC to make minimum payments on monthly or yearly intervals until the note is fully paid. On the other hand, a finding that the large payments were for the sale of a business would mean that Sullivan received only a minimal salary in 2004. A minimal salary is understandable, however, if Sullivan received income of $175,000 in 2004 for sale of a business, especially given that all of the money came from a single company that was owned by a trust for Sullivan's benefit.

-12-

Either characterization of the payments results in some anomalies in the company records. Speaking to different audiences, Sullivan variously described the large payments in 2004 and 2005 as "for prior services," as commissions or bonuses, or as proceeds from the sale of a business. Given the conflicting information, it was not unreasonable for Unum to reject Sullivan's most recent characterization of the evidence, and to accept his corroborated representations made under penalty of perjury to the Social Security Administration.

For these reasons, we conclude that Unum did not abuse its discretion in calculating Sullivan's benefits. We therefore reverse the judgment of the district court awarding benefits, attorneys' fees, and costs to Sullivan's representative, and we remand the case for consideration of Unum's counterclaims.

BRIGHT, Circuit Judge, dissenting.

While I agree with my colleagues that the district court abused its discretion in awarding attorneys' fees to Sullivan, I would affirm that portion of the district court's decision awarding benefits to Sullivan.

The main question in this case is whether Unum's decision to characterize the large payments to Sullivan in 2004 as payments from the prior sale of a business is supported by substantial evidence in the record (more than a scintilla, but less than a preponderance). *See Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 583 (8th Cir. 2008)(holding substantial evidence supported determination to deny benefits on the basis that the participant was not continuously disabled throughout the 180-day elimination period).

In making their determination, Unum cites Sullivan's changing positions regarding the characterization of the large payments and relies heavily on Sullivan's submissions to the Social Security Administration ("SSA"). Sullivan initially told the

SSA that the large payments he received were payments for the sale of a business and not compensation for his work. Sullivan noted his "monthly salaries were between $720 and $800 . . . allowing him to continue receiving [SSA disability] payments." In the amortization schedule provided to the SSA, the total amount of the payments made to Sullivan each year matches the amounts of large payments listed as "for prior services" in the ledgers provided by Holmquist, though with some discrepancy in the dates of the payments. In his March 2009 interview with Unum, Sullivan also stated the large increase in his 2003 income was partly based on the sale of the business to IHPC and that IHPC still owed him $36,064 on the sale. Sullivan now claims the large payments should properly be considered a bonus.

Sullivan's explanation to Unum of when and how IHPC made payments for the prior sale of the business does not square with the record. Sullivan submitted a letter from his Certified Public Account ("CPA") stating no payments were made on the sale of the business until 2008. The letter directly contradicts the statement Sullivan made to the Unum representative in 2009 about the increase in his 2003 income.

However, there is substantial evidence in the record supporting Sullivan's position. First, Sullivan withdrew his request for reconsideration to the SSA before the SSA made a final determination regarding his disability payments, and he informed Unum of this at the time he provided Unum with a copy of the documents. Second, a number of the documents Sullivan submitted to Unum consistently treat the large payments to Sullivan as compensation for his work. Sullivan provided IHPC's federal tax returns from 2001–2004 which reported the full amount the company paid Sullivan during those years as compensation for officers. Sullivan also provided his W-2 forms for 2003 and 2004 listing his income as salary from IHPC. Holmquist's ledgers also record the full amount paid to Sullivan as officer salary in both an overview sheet of the company's finances from 2000–2004, and in more detailed tables breaking down Sullivan's pay from 2004–2006. While the detailed ledgers list the large payments as "for prior services," Sullivan states that phrase simply means

-14-

services provided earlier in the year. Sullivan also provided detailed earning statements from 1999–2007. Finally, it strains credibility to believe that the founder and president of IHPC would only be paid $4,440 in semi-monthly payments in a year where the company had sales over $4.4 million.

This case suffers from a lack of documents that provide a satisfactory explanation of how and when IHPC made payments on the $440,000 promissory note. Nonetheless, Sullivan's withdrawal of his request for reconsideration to the SSA undercuts the prior statements to the SSA that the payments in question were for the sale of a business. The rest of the evidence marshaled by Unum is not substantial enough to overcome the weight of the documents that explicitly treat the large payments to Sullivan as officer compensation. IHPC has consistently considered the payments to Sullivan as salary in its records and tax filings. There is simply insufficient evidence in the record for Unum to have determined otherwise.

As for whether Unum reasonably characterized the $175,000 payments in 2004 as commission and not bonus, I would conclude it did not. The distinction between commission or bonus in the policy determines the time frame used to calculate Sullivan's benefit. If the payments are a bonus, the time frame includes a $150,000 payment that the commission time frame would exclude. Unum initially characterized the large payments as a commission and continues to support that argument on appeal.

The policy does not define commission or bonus. Under the abuse of discretion standard, this court defers to the administrator's interpretation of the plan "so long as it is reasonable, even if the court would interpret the language differently as an original matter." *Khoury v. Grp. Health Plan Inc.*, 615 F.3d 946, 954 (8th Cir. 2010) (quotation omitted). Under *Finley v. Special Agents Mut. Ben. Ass'n, Inc.*, 957 F.2d 617, 621 (8th Cir. 1992), this court considers whether the plan administrator's interpretation "(1) is consistent with the plan's goals; (2) renders any of the plan

language meaningless or internally inconsistent; (3) conflicts with the substantive or procedural requirements of ERISA; (4) has been followed similarly in the past; and (5) is contrary to the clear language of the policy." *Khoury*, 615 F.3d at 954 (citing *Finley*, 957 F.2d at 621).

Unum mainly relies on Holmquist's responses regarding whether Sullivan's pay was commission or bonus in making their determination to classify Sullivan's income as commission. However, Holmquist himself was far from clear on how to characterize the payments: "[Sullivan]'s officer salary is inclusive of a commission. The commission could be called a bonus, depending on the definition used. . . . It is all commission, unless definitions would deem part of it bonus." Unum also cites to Sullivan's resume, which notes his salary at IHPC was "$180,000/year, plus commissions." However, as Unum acknowledges, Sullivan also referred to the payments at various times as dividend, salary, and commission/bonus. Sullivan also demurred to Holmquist on several occasions with regard to how to characterize his income. Given Sullivan's lack of knowledge on the issue and the vacillating nature of Holmquist's answers, it was unreasonable for Unum to have relied on Sullivan's or Holmquist's representations in concluding the payments were a commission.

"[W]ords are to be given their plain and ordinary meaning as understood by a reasonable, average person." *Finley*, 957 F.2d at 622 (quotation omitted). While acknowledging plan terms should be given their ordinary meaning, Unum does not provide any evidence to support what the ordinary meaning of commission and bonus should be. The district court turned to dictionary definitions to settle the issue. And this court has noted several times in this context, "[r]ecourse to the ordinary, dictionary definition of words is not only reasonable, but may be necessary." *Khoury*, 615 F.3d at 955 (quotation omitted).

Webster's Third New International Dictionary defines "commission" as "a fee paid to an agent or employee for transacting a piece of business or performing a

service . . . *esp.*: a percentage of the money received in a sale or other transaction paid to the agent responsible for the business" with the examples of "a broker receives a [commission] on each share of stock bought for a customer" and "a [commission] of 9 percent on each sale." Webster's Third New International Dictionary 457 (2002). The Oxford English Dictionary defines "commission" as "[a] remuneration for services or work done as agent, in the form of a percentage on the amount involved in the transactions; a *pro rata* remuneration to an agent or factor." 1 The Compact Edition of the Oxford English Dictionary 481 (1984).

Webster's defines "bonus" as "money or an equivalent given in addition to the usual compensation . . . (2): the payment made by the employer under a bonus system" with the example of "surplus profits distributed among the workers as a [bonus]." Webster's Third New International Dictionary 252 (2002). Another definition is "[m]oney or its equivalent, given as a premium, or as an extra or irregular remuneration, in consideration of offices performed, or to encourage their performance . . . ." 1 The Compact Edition of the Oxford English Dictionary 247 (1984).

Sullivan received the vast majority of his salary in one or two large payments each year, partially based on the company's cash position and liquidity needs at the time. Beyond the loose tie to the company's annual revenue, the record is completely devoid of any connection between Sullivan's payments and the type of specific business, sale, or transaction represented by the definitions of "commission." To fit the ordinary definition of commission, Sullivan would have needed to be paid a percent of each sale or piece of business he was responsible for——not based on the performance of the company as a whole. As president, his duties included much more than sales and marketing. The large payments to Sullivan are more naturally characterized as being made "under a bonus system" in consideration of Sullivan's performance and to encourage further performance and growth of the company.

Finally, consideration must be afforded to the remaining four *Finley* factors in reviewing Unum's interpretation of commission and bonus. Unum's interpretation is consistent with the plan's goals insofar as it provides Sullivan with at least some disability benefits. Their interpretation also does not render any of the plan language meaningless or internally inconsistent, nor does it conflict with the requirements of ERISA. Finally, the record is silent as to how Unum has interpreted the policy provisions relating to commissions and bonuses in the past.[1] While the remaining four *Finley* factors do not weigh against Unum, they also do not overcome the mischaracterization of the plain and ordinary meanings of commission and bonus. Therefore, Unum was not reasonable in characterizing Sullivan's payments as a commission.

Unum abused its discretion in determining the large payments to Sullivan were from the sale of a business and not compensation in the form of bonuses. Accordingly, I would affirm the judgment of the district court and award Sullivan benefits.

---

[1]We have noted that even "if the interpretation is unreasonable from the beginning, such an interpretation may still be arbitrary and capricious." *Lickteig Bus. Men's Assurance Co. of Am.*, 61 F.3d 579, 585 (8th Cir. 1995) (quotation omitted).