GARTH, Circuit Judge,
dissenting.
While I have no quarrel with the majority’s statutory analyses, I reach a different result and, therefore, respectfully dissent.
I have looked beneath the surface of the principles upon which the majority rely, to the fair and equitable roots of this controversy with Standard. As a result, I would remand this case to the District Court to explore and determine the equitable factors in play, as well as the conflict and ambiguities that have resulted in a complete frustration of Dr. Fleisher’s objectives and expectations.
Dr. Fleisher, a dentist specializing in endodontistry, in an effort to protect his future earning capacity, subscribed to a North American Disability Policy in 1979. He was to receive a benefit of $1,500 a month. At that time, he was not disabled, but he was aware of the possibility that he might be in future years. Accordingly, when he became eligible for a group policy, he subscribed to one written by the Standard Insurance Company. This was some 23 years after he had subscribed to his initial disability policy with North American. His later subscription to the Standard policy was obviously to protect and augment his financial livelihood, by insuring that he had increased protection in the event he became disabled.
In January 2008, he became disabled and claimed the benefits under both policies, Standard, for the first time, informed him that he could not receive the $10,000 a month which was the amount of the policy which he had taken out. Why? Because the 1979 policy to which he had originally subscribed was, in Standard’s opinion, a “group policy” and, as such, the amount of the benefits which Dr. Fleisher could receive from the Standard policy was reduced by the amount of the North American policy benefit that he would henceforth receive.
Accordingly, at this time, Dr. Fleisher, who is no longer eligible for disability benefits from any company and can no longer subscribe for disability protection, is remitted to $10,000 a month, rather than $11,500 a month, the sum total of both policies which he had taken out.
Why should this be, when the Standard policy at no time brought to Dr. Fleisher’s attention the deductibility provision of the Standard policy, nor did it acquaint him with any definitions of the terms: “group policy”, “individual policy”, or “franchise policies”?
All members of the majority and I (as well as the District Court judge) agree that the terms and language of the Standard Insurance policy are ambiguous. Nowhere in the Standard policy are the terms “group insurance” and “individual insurance” defined. No matter how diligently one may look at or study the Standard policy, there is no guidance to help the policyholder determine the characteristics of either type of policy or how these char *129 acteristics would affect the benefits that Dr. Fleisher expected to receive.
Moreover, although the District Court and the majority here have focused their analysis on “franchise policies,” and have detailed the characteristics of a “franchise policy,” neither the Standard policy nor the individual policy that Dr. Fleisher originally purchased, even mention, much less define, the term “franchise policy.” Yet the characteristics and definition of a “franchise policy” dominate and control the holding of both the District Court opinion and the majority opinion here.
“Franchise policies” were never described in any insurance document that Dr. Fleisher had received, but are rather a matter of characterization that can be found only in an insurance treatise such as Appleman’s.
As to the characterization of the individual and group policies, there was no warning or alert given to Dr. Fleisher which could send up a red flag warning that he should not purchase the Standard policy with its deductible provisions or that if he did, he would not achieve the disability benefits that he sought to receive. (See footnote 1, supra.) In other contexts, our society has taken great pains to alert consumers of products detrimental to their well-being: warnings appear in large letters in the advertisements and on the packaging of tobacco, drugs, and alcohol. Large block lettering or other emphatic warnings on the Standard policy might have alerted Dr. Fleisher to the problem that he now faces.
It is well established that when the language of an insurance policy is ambiguous, that language must be construed most strongly against the insurance company that drafted it. American Legacy Foundation, R.P. v. National Union Fire Ins. Co., 623 F.3d 135, 139 (3d Cir.2010) (quoting Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1195-96 (Del.1992)).
In the present case, the Standard policy to which Dr. Fleisher subscribed at no time alerted him to its deductible provisions, nor did Standard offer an interpretation of those provisions so that a layperson such as Dr. Fleisher could assess the protection that he was seeking. Further, as I have emphasized, the Standard policy makes no mention of the status or even the nature of a “franchise policy,” a characterization which governs the District Court’s and the majority decisions.
The mere fact that this case implicates ERISA does not mean that these basic fundamental contract principles should be ignored. “In interpreting plan terms for purposes of claims under § 1132(a)(1)(B), we apply a federal common law of contract, informed both by general principles of contract law and by ERISA’s purposes as manifested in its specific provisions.” Burstein v. Retirement Account Plan for Employees of Allegheny Health Education and Research Foundation, 334 F.3d 365, 381 (3d Cir.2003) (Emphasis added, internal quotation marks omitted, internal citations omitted).
Although there is no direct precedent that confirms ERISA must be considered in light of equitable realities, there are countless instances in which equity has been predominant in ERISA’s concerns. See, e.g., Skretvedt v. E.I. DuPont De Nemours, 372 F.3d 193, 196 (3d Cir.2004) (prejudgment interest on an ERISA award is governed in certain circumstances not by “a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. It is denied when its exaction would be inequitable.”) (Quoting Board of Commissioners of Jackson County, Kansas v. United States, 308 *130 U.S. 343, 352, 60 S.Ct. 285, 84 L.Ed. 313 (1939)). (Italics added.)
Dr. Fleisher’s situation is particularly problematic in light of the conflict under which the Standard administrator labors. The conflict that Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) and Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) have recognized where the benefit-giver and the administrator of the benefit are the same, is clearly patent on this appeal. Standard profits by the deduction of $1500 per month from Dr. Fleisher’s benefits. It does so by relying wholly upon an extraneous statement in the North American policy, which reads “[h]aving issued group policy PGA320, hereinafter called ‘policy.’”
Standard, the District Court, and the majority here discredit North American’s own characterization of its own [North American] policy. North American’s Assistant Vice President, Mr. Ken Selasky has clearly written and explained that “even though this [North American] policy was issued through this group [AAE], it is an individual income policy and we are treating all aspects of Dr. Fleisher’s claim as an individual disability income policy.” (Emphasis added).
The District Court and the majority completely overlook the nature of the North American policy, to wit, that it was individually underwritten, non-cancellable, guaranteed renewable, that Dr. Fleisher paid his premiums and made claims directly to North American, that he enrolled for coverage directly with North American, and that he received an individual billing statement. These are not traditional group policy characteristics. These are the basic characteristics of an individual policy.
Our Supreme Court has said that it is “more important (perhaps of great importance) where the circumstances suggest a higher likelihood that it affects the benefits decision ... to take steps to reduce potential bias and to promote accuracy.” Glenn, supra 554 U.S. at 117, 128 S.Ct. 2343. In other words, to properly consider the impact of conflict of interest in determining the reasonableness of an administrator’s decision, a reviewing court must consider the closeness of the ease and the severity of the conflict of interest.
The District Court, in dismissing Dr. Fleisher’s complaint, did not undertake any factfinding or substantial discussion related to the administrator’s conflict of interest or its severity. Although the District Court acknowledged that a conflict of interest did in fact exist, the order dismissing Fleisher’s complaint summarily concluded that “this is not so close a case that any conflict of interest would break the tie and tip the scales in favor of the plaintiff.” Although my colleagues in the majority agree with the District Court, I cannot. This case goes beyond the point of being close, to the point of the administrator’s decision being incorrect — if ever there were a situation where the administrator’s conflict of interest must properly be considered as a factor, this is it!
Indeed, it should be remembered that the District Court dismissed Dr. Fleisher’s complaint pursuant to F.R.A.P. Section 12(b)(6). Such a dismissal requires that a Court accept the allegation of the complaint as true, and that it construe the complaint in the light most favorable to the plaintiff.
Dismissal with prejudice is a drastic sanction termed “extreme” by the Supreme Court in National Hockey League v. Met. Hockey Club, 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976), yet, here, the District Court did not only dismiss Dr. Fleisher’s complaint, with preju *131 dice, but in doing so, it dealt with the merits of his action.
If the hallmark of the District Court’s “arbitrary and capricious standard of review” is reasonableness, and if the relevant inquiry, as the majority of this Court states, “.... is not whether it is reasonable to interpret the North America policy as an individual policy, but whether it is unreasonable to interpret it as group insurance,” Maj. Op. at 127, then I suggest that we should look to other measures of dismissal for a balancing of what is or is not reasonable.
In Poulis v. State Farm Fire and Casualty Company, 747 F.2d 863 (3d Cir.1984), this Court, by Judge Sloviter, prescribed a test consisting of six (6) factors by which a dismissal with prejudice should be balanced and analyzed.[1] True, the Poulis case involved a sanction and did not arise under the ERISA statute, but it is instructive to recognize the length to which we have gone in preserving cases for a merits determination rather than dismissing them on a mere reading of the complaint.
While the context of Poulis differs from Dr. Fleisher’s claims, it is quite evident that prejudice is one of the most significant factors in determining the appropriateness of dismissal. And what could be more prejudicial or conflict-ridden than the actions of Standard in decreasing Dr. Fleisher’s benefits by $1500 a month while it continues to receive premiums based on $10,000 in coverage?
I see no reason why the same sort of analysis should not be employed in an ERISA context where the reasonableness of a dismissal is at issue. A balancing of prejudice and a balancing of the factors that result in a dismissal would only improve the analysis of a Section 12(b)(6) dismissal under ERISA.
The majority has held that the District Court was not unreasonable to interpret the North America policy as a group insurance policy. I, of course, disagree using the same loadstar of reasonableness as did the majority.
While I am loathe to discount all of the analyses found in the majority opinion, I cannot accept the fact that fair and equitable means should be so thoroughly disregarded in favor of fitting a legal square peg into a legal round hole. To me, the majority has resolved Dr. Fleisher’s problem by merely seeking out some the legal principles which would support its conclusion without regard to the fundamental precepts of equity, fairness and justice[2]. A major consideration on this appeal should include judicial insight to the nature of the problem, the nature of the conflict which the administrator of an ERISA plan must analyze, the nature of the ramifications that may ensue from this Court’s decision, and the nature of the actions that a litigant can take to protect a particularly vital interest.
When I assemble these various concerns and concepts in this case, I realize that this entire area of equitable concern has not been addressed in any fashion by the majority. I conclude that we should re *132 deem this failing by remanding this appeal to the District Court for consideration of the various factors and particularly the equitable and fairness elements to which I have adverted.
I, therefore, respectfully dissent.

.In Poulis v. State Farm Fire and Casualty Company, 747 F.2d 863, 868 (3d Cir.1984), we required the District Court to assess:
1. The extent of the parties responsibility;
2. prejudice to the adversary;
3. a history of dilatoriness;
4. whether the attorney’s conduct was willful or in bad faith;
5. alternative sanctions; and
6.the meritoriousness of the claim, cautioning that dismissal must be a last resort.

. The goal to which we as judges are all wedded, in addition to the oath which we take, is found in Deuteronomy 16:20, “Justice, justice shalt thou pursue.”