POSNER, Circuit Judge.
This case is about fibromyalgia, “a common and chronic disorder characterized by widespread pain, diffuse tenderness, and a number of other symptoms. The word ‘fi-bromyalgia’ comes from the Latin term for *1137 fibrous tissue (fibro) and the Greek [terms] for muscle (myo) and pain (algia). ... [F]ibromyalgia can cause significant pain and fatigue, and it can interfere with a person’s ability to carry on daily activities. ... Scientists estimate that fibromyalgia affects 5 million Americans age 18 or older.” National Institute of Arthritis and Musculoskeletal and Skin Diseases, “Questions and Answers about Fibromyalgia,” July 2014, www.niams.nih.gov/Health_Info/ Fibromyalgia/defaultasp (visited May 16, 2017, as were the other websites cited in this opinion). “‘Chronic’ means that the pain lasts a long time—at least 3 months or longer. Many people experience fibro-myalgia pain for years before being diagnosed. “Widespread’ means that it is felt all over, in both the upper and lower parts of the body. However, many people with fi-bromyalgia feel their pain in specific areas of their body, such as in their shoulder or neck. And ‘Tenderness’ means that even a small amount of pressure can cause a lot of pain.” Lyrica, “Fibromyalgia [Frequently Asked Questions],” www.lyrica.com/ frequently-asked-questions#fibromyalgia.
As further explained by the Mayo Clinic, “Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep; memory and mood issues. Researchers believe that fi-bromyalgia amplifies painful sensations by affecting the way your brain processes pain signals. Symptoms sometimes begin after a physical trauma, surgery, infection or significant psychological stress. In other cases, symptoms gradually accumulate over time with no single triggering event. Women are much more likely to develop fibromyalgia than are men. Many people who have fibromyalgia also have tension headaches, temporomandibular joint (TMJ) disorders, irritable bowel syndrome, anxiety and depression.” Mayo Clinic, “Fi-bromyalgia,” www.mayoclinic.org/diseases-eonditions/fibromyalgia/home/ovc-20317786 (emphasis added).
There used to be considerable skepticism that fibromyalgia was a real disease. No more. See, besides the websites already cited, Anne Underwood, “The Long Search for Fibromyalgia Support,” New York Times, Sept. 23, 2009, wwwmytimes. com/ref/health/healthguide/esn-fibromy algiaess.html; and Valencia Higuera, “Fi-bromyalgia: Real or Imagined?,” Health-line Newsletter, Aug. 17, 2016, www. healthline.com/health/fibromyalgia-real-or-imagined.
And finally the American College of Rheumatology offers the following harrowing description of the disease: “Fibromyal-gia is a neurologic chronic health condition that causes pain all over the body and other symptoms. Other symptoms of fibro-myalgia that patients most often have are: Tenderness to touch or pressure affecting muscles and sometimes joints or even the skin. Severe fatigue. Sleep problems (waking up unrefreshed). Problems with memory or thinking clearly. Some patients also may have: Depression or anxiety. Migraine or tension headaches. Digestive problems: irritable bowel syndrome (commonly called IBS) or gastroesophageal reflux disease (often referred to as GERD). Irritable or overactive bladder. Pelvic pain. Temporo-mandibular disorder—often called TMJ (a set of symptoms including face or jaw pain, jaw clicking, and ringing in the ears).” American College of Rheumatology, “Fi-bromyalgia,” www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/ Fibromyalgia.
Eli Lilly and Company is a global pharmaceutical corporation headquartered in Indianapolis. And it is familiar with fibro-myalgia because it markets a drug called Cymbalta (a trade name for Duloxetine) for treating the disease. It has retained an expert on fibromyalgia, Dr. Daniel Clauw of the University of Michigan, a physician and professor of rheumatology, to advise it *1138 on the disease, and he has pointed out that many persons afflicted with fibromyalgia “end up needing to stop working because of this condition” and that the disease “is not only very common but is typically also very disabling.”
So much for background; now for the case:
Cathleen Kennedy, the plaintiff, was hired by Lilly in 1982 and rose rapidly, eventually becoming an executive director in the company’s human resources division, with a monthly salary of $25,011. But at the beginning of 2008 she was forced to quit work because of disabling symptoms of fibromyalgia. As a participant in the company’s Extended Disability Benefits plan, she requested benefits upon ceasing to work, and effective May 1, 2009, was approved for monthly benefits of $18,972.44. Three and a half years later, however, her benefits were terminated, precipitating this suit by her against Lilly’s self-funded Extended Disability Plan based on the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq., which so far as pertains to this case sets minimum standards for voluntarily established health and pension plans in private industry. See Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105, 115, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). Lilly’s disability plan has discretion to deny claims that it deems not to meet its standard, but a reviewing court will overturn a denial of benefits if the plan’s decision is unreasonable. Edwards v. Briggs & Stratton Retirement Plan, 639 F.3d 355, 360 (7th Cir. 2011).
The plan states that an employee has a “disability” if unable “to engage, for remuneration or profit, in any occupation commensurate with the Employee’s education, training, and experience.” Kennedy’s benefits were revoked by Lilly’s Employee Benefits Committee (the administrator of the plan), on the ground that her fibro-myalgia was not disabling.
The district judge granted summary judgment in favor of Ms. Kennedy and awarded her $537,843.81 in past benefits (benefits she should have received but did not) and pre-judgment interest, and in addition the judge ordered Lilly to reinstate Kennedy’s disability benefits retroactive to December 2012 and resume the payment of her monthly benefits. Lilly based its unsuccessful case in the district court on evidence presented by a number of doctors (oddly not including Dr. Clauw), but the evidence turned out to be a hodge-podge. For example, Lilly sent Kennedy to be examined by a Dr. Schriber in Dayton, Ohio, more than 100 miles from Kennedy’s home in Indianapolis. The doctor conducted a physical exam of her that lasted all of five minutes. He testified that the “American College of Rheumatology does not consider fibromyalgia to be disabling on a long-term basis.” That, as we know from our earlier quotation from the ACR is false; and Lilly itself appears not to have relied on Dr. Schriber’s opinion in its decision to terminate Kennedy’s benefits.
A psychiatrist named Dr. Osman advised Lilly that Kennedy “from a psychiatric standpoint ... has no restrictions or limitations,” but based this on her having been diagnosed with Major Depressive Disorder and Anxiety Disorder rather than with fibromyalgia, a disease about which as a psychiatrist he could not be expected to offer an authoritative opinion; apparently he offered no opinion. Another psychiatrist, Dr. Goldman, opined similarly. And a urologist, Dr. Davi, after reviewing Kennedy’s medical records, told Lilly that she was not disabled from working “from a urology perspective,” which Kennedy does not dispute and in any event seems irrelevant.
Kennedy’s general internist, Dr. Condit, testified that she’s permanently disabled, *1139 basing this opinion on his diagnoses of her nonarticular rheumatism (musculoskeletal aches and pains not traceable to joints), fibromyalgia, sleep disorder, depression, irritable bowel syndrome, restless leg syndrome, and her symptoms of pain and fatigue.
Dr. Condit retired and Dr. Steven Neucks became Kennedy’s treating rheu-matologist. He testified to her “pain, poor quality sleep, fatigue, and difficulty concentrating,” remarked that “because of her fibromyalgia and degenerative arthritis, as well as her underlying discomfort, I do not think that she can- work a regular work schedule,” and added that he “thought [that] at [her] last visit [to him] her function level had declined slightly and that her anxiety was significantly worse.” And he commended her for her “consistency and lack of attempt to over dramatize her limitations,” adding that “is I believe, suggestive of forthright presentation.”
Dr. Dayton Payne, reviewing Ms. Kennedy’s disability claim but not examining her, opined that she was able to return to her past job, while acknowledging mention in the medical record of fatigue, irritable bowel, interstitial cystitis, depression, anxiety, attention deficit disorder, diffuse tenderness, and tender points. Dr. Payne appears not to have credited these symptoms, saying that “all of the laboratory data in this file are normal.” But as the district judge pointed out, it is error to demand laboratory data to credit the symptoms of fibromyalgia—the crucial symptoms, pain and fatigue, won’t appear on laboratory tests. Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 919 (7th Cir. 2003).
Another doctor hired by the company, Dr. Dikranian, a rheumatologist, reviewed Kennedy’s medical records and expressed skepticism about whether she had fibro-myalgia at all. But as with Dr. Schriber even Lilly seems not to have credited Dr. Dikranian’s evaluation. The company’s Employee Benefits Committee didn’t mention his conclusions in its decision, and is represented by Lilly as having grudgingly “acknowledged that Kennedy does have fibromyalgia and that fibromyalgia has caused her “some restrictions and limitations” (emphasis added).
All deficiencies in its evidence to one side, Lilly has failed to indicate what job or kind of job, and at what level, Kennedy would be capable of performing if the company is permitted to cancel her benefits. Dr. Neucks opined that Kennedy “could do [only] a low stress, non-high cognitive functioning job at about 30 hours a week,” which equals six hours a day. Neucks further opined that she would experience “flares” that would prevent her from working for one or two days a month, further shrinking her job prospects and presumably her salary. “Fibromyalgia is ... characterized by chronic, widespread pain, fatigue, cognitive impairments, poor sleep, and mood difficulties.... These symptoms ... appear to undergo periods of exacerbation or worsening, often colloquially referred to as ‘flares’ by patients and their health care providers.” Ann Vincent et al., “Fibromyalgia Flares: A Qualitative Analysis,” 17 Pain Medicine 463 (2016), http://academic.oup.com/ painmedicine/artiele-lookup/doi/10.1111/ pme.12676.
Ms. Kennedy was informed by a liaison to the Employee Benefits Committee that if she could work 20 hours per week as a secretary she would not be considered disabled. Yet in its written decision the Committee said only that Kennedy could work in “various non-executive positions in compensation, benefits, and other human resources fields,” which is both vague and inconsistent with the medical evidence. If Dr. Neucks is correct about the flares (and there is no evidence that he’s not), Kenne *1140 dy wouldn’t be able to work any regular schedule. Another questionable aspect of Lilly’s case is the company’s conflict of interest, by reason of its being both the initial adjudicator of an employee’s benefits claim (via Lilly’s Employee Benefits Committee) and the payor of those benefits. See Metropolitan Life Insurance Co. v. Glenn, supra, 554 U.S. at 108, 128 S.Ct. 2343. By cutting off Kennedy’s benefits the company has saved itself about $2.5 million. Big as Lilly is, that’s not a trivial loss.
The judgment of the district court is
AFFIRMED.