# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-3589

_____

Theodore F. Ingram

*Plaintiff - Appellant*

v.

Terminal Railroad Association of St. Louis Pension Plan for Nonschedule Employees

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 21, 2015
Filed: January 29, 2016

_____

Before LOKEN, BENTON, and SHEPHERD, Circuit Judges.

_____

LOKEN, Circuit Judge.

In 2006, Theodore Ingram was employed by Union Pacific Railroad ("Union Pacific") and living in Los Angeles. On July 1, he was hired to be the Superintendent of Transportation of the Terminal Railroad Association of St. Louis ("Terminal") and moved to St. Louis. Ingram elected to receive early retirement benefits from Union Pacific beginning January 1, 2010. When he retired from Terminal at the end of 2010, he became eligible for retirement benefits under Terminal's Pension Plan for

Nonschedule Employees (the "Plan"). In this action under § 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), Ingram alleges that the Plan erroneously determined his pension benefits by (i) excluding a 2006 sign-on bonus from pension-qualifying earnings and (ii) improperly inflating the offset for retirement benefits Ingram receives from Union Pacific. Reviewing for abuse of discretion, the district court[1] granted summary judgment in favor of the Plan, concluding that the administrator's decisions were reasonable. Ingram appeals. Reviewing the grant of summary judgment *de novo*, we affirm.

## I. The ERISA Standard of Review.

We review *de novo* whether the district court applied the appropriate standard of review to the Plan administrator's decision. Jobe v. Med. Life Ins. Co., 598 F.3d 478, 480-81 (8th Cir. 2010). Applying trust law principles, the Supreme Court held in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111-13 (1989), that the administrator's interpretation of an ERISA plan is reviewed *de novo* unless the plan expressly grants discretionary authority to make benefit determinations. If the administrator has discretionary authority, the plan's decision is subject to abuse-of-discretion review. In this case, § 14.6 of Terminal's Plan unquestionably granted discretion to interpret the Plan, providing that the administrator "shall perform its duties as the Plan Administrator in its sole discretion shall determine is appropriate."

Ingram argues that we should nonetheless apply a less deferential *de novo* standard of review because "a palpable conflict of interest or a serious procedural irregularity existed, which . . . caused a serious breach of the plan administrator's fiduciary duty." Anderson v. U.S. Bancorp, 484 F.3d 1027, 1032 (8th Cir. 2007). The Supreme Court largely overruled our prior cases applying this

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

principle in Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008). Again applying the law of trusts as adopted in Firestone and reflected in the Restatement (Second) of Trusts § 187 cmt. d (Am. Law. Inst. 1959), the Court in Glenn affirmed a Sixth Circuit decision that considered an alleged conflict of interest and various alleged procedural regularities as factors to be weighed in determining whether a plan administrator with discretionary authority had abused that discretion. Id. at 116-19. As the Court explained, "We do not believe that Firestone's [reference to an administrator's financial conflict of interest] implies a change in the *standard* of review, say, from deferential to *de novo* review. Trust law continues to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion." 554 U.S. at 115.

Here, none of the conflicts of interest and procedural irregularities alleged by Ingram "caused a serious breach of the plan administrator's fiduciary duty" which warranted departure from the abuse-of-discretion standard of review under Glenn. Johnson v. United of Omaha Life Ins. Co., 775 F.3d 983, 987 (8th Cir. 2014). The district court correctly reviewed the decision of the Plan administrator, Terminal CFO Kerry Paubel, for abuse of discretion.[2]

---

[2]Ingram contends that Paubel's initial lack of knowledge that he was Plan administrator was a material procedural irregularity that warrants *de novo* review. This contention is without merit. Paubel was aware he had been delegated Terminal's decisionmaking authority and timely advised Ingram he would decide Ingram's claim. There was not even an arguable breach of fiduciary duty in exercising that authority, consistent with the Plan, whether Paubel did so as Terminal's designee, or as the Plan administrator appointed by Terminal's Board of Directors some years earlier.

## II. The Sign-On Bonus Issue.

A. The Ruling at Issue.  When Ingram retired, § 5.1(a) of the Plan provided that retirement benefits were calculated based on "1.5% . . . of the Average Monthly Earnings of the Participant," defined in § 2.6 as the average monthly earnings in the five consecutive calendar years in which Ingram's earnings were the highest.  Ingram worked at Terminal only fifty-four months, the 2006 part year and full years 2007-2010.  Section 2.14 defined earnings as:

> The total earnings paid during the applicable period by an Employer subject to income tax withholding as reported on Treasury Department Form W-2, excluding reimbursement of moving expenses, reimbursements or other expense allowances and fringe benefits . . . .

The Plan gave retiring Participants benefit payment options.  Ingram chose the Single Life Annuity monthly payment option.  Plan administrator Paubel determined that Ingram's Average Monthly Earnings for the fifty-four months were $15,357.60.  This produced a Gross Pension of $9,214.56 per month, an Eligible Pension of $7,400.71 per month, and, after the offset discussed in Part III of this opinion, a Single Life Annuity benefit of $3,170.71 per month.  Paubel rejected Ingram's contention that his Average Monthly Earnings should include a July 2006 "Sign On Bonus" of $142,737.20 ("the July 2006 payment"), concluding that the Sign On Bonus was an excludable moving expense allowance.  Including that amount in the calculation would apparently have increased Ingram's Average Monthly Earnings by 17.2% and his Single Life Annuity monthly benefit by nearly 50%.

B. Procedural Background.  When Ingram advised Paubel in July 2010 that he planned to retire at the end of the year, Paubel said that the July 2006 payment would not be included as earnings under Plan § 2.14 because it fell within the moving

expenses exclusion. Ingram submitted a claim for benefits under the Plan, arguing that the Sign On Bonus should be included in calculating his pension annuity:

> When I signed on to work for [Terminal] in 2006 I was provided with a Sign On bonus for the following reasons:
>
> > 1. I took a cut in pay to take the job.
> > 2. [Terminal] had no relocation or moving expense policy.
>
> There were no conditions attached to the bonus and no requirements to turn in receipts or an expense report showing how the bonus money was spent.

Ingram attached as supporting documents (i) a July 2006 pay stub showing a $142,737.20 "bonus," reduced by various tax deductions to "net pay" of $92,293.00; (ii) a year-end pay stub showing the Sign On Bonus and a year end bonus (which was included in his Average Monthly Earnings) added together; (iii) his Form W-2 for 2006 showing the Sign On bonus included in taxable income; and (iv) a July 13, 2006, note from Paubel attaching "my . . . calculation of your sign on bonus." The attached spreadsheet, dated July 1, 2006, was titled "Signing Bonus - T. F. Ingram" and recorded Gross Pay of $142,737.20 reduced by various tax deductions to a "Net Bonus Amount" of $85,000.

In a letter dated January 21, 2011, Paubel denied Ingram's claim and enclosed affidavits submitted to the Plan administrator by former Terminal President Billy Broyles and by Director of Human Resources, Corporate Secretary, and Assistant to the President Shannon Nouri. Broyles averred that, in 2006, he offered Ingram a position with Terminal and "negotiated Mr. Ingram's compensation with him, including his compensation for relocation expenses." Though Terminal "had no formal relocation policy," it was company practice "to provide individuals who relocated to accept a senior position with the Company compensation for relocating." After agreeing with Ingram on a lump sum payment, Broyles instructed Nouri to

consult with CFO Paubel and "determine a reasonable amount to be paid . . . to reimburse [Ingram] for the expenses of moving." Nouri averred that she and Paubel "determined that $85,000 would be an appropriate amount to compensate Mr. Ingram for relocation." Paubel determined an additional amount Ingram would be paid "as a 'gross up' for taxes Mr. Ingram would incur on $85,000." Nouri also averred that, in 2006, it was Terminal's practice to reflect "most expense reimbursements (including moving expense reimbursements) . . . as salary or bonus." Both Broyles and Nouri averred that "[n]o portion of the $142,737.20 was intended as compensation for taking a cut in pay."

Relying on these affidavits, and on Ingram's acknowledgment "that the amount was paid (at least in part)" because Terminal had no relocation or moving expense policy, Paubel's lengthy letter denied Ingram's claim. "I interpret the plan language [in § 2.14] excluding 'reimbursement of moving expenses, reimbursements or other expense allowances' as encompassing amounts provided as an allowance in recognition of expenses incurred in moving and relocating, regardless of whether they were conditioned on proof and documentation of actual expenses incurred."

Invoking the Plan's appeal procedure, Ingram appealed Paubel's initial claim denial, submitting an affidavit responding to the facts recited in the affidavits of Broyles and Nouri.[3] Ingram averred that, because the salary Terminal offered in 2006 was $34,000 less than he was making in California, "I inquired about a moving package." Broyles advised it was not Terminal's policy to pay moving expenses. Ingram said he was interested in the position "but I could not afford to absorb the salary cut and my costs in leaving Los Angeles." Broyles asked how much Ingram would need to come to work for Terminal. "After reviewing the numbers with my wife, I contacted Bill and told him that I would need to clear about $83,000 after

---

[3]Ingram's appeal also raised for the first time the offset issue considered in Part III of this opinion. Terminal concedes the issue was timely raised.

taxes to make the move financially feasible." Ingram's appeal further relied on a July 1, 2006, letter agreement, signed by Broyles and accepted by Ingram, confirming that Ingram would be employed based on a "compensation package" that included an annual salary of $115,000, "$85,000 sign on bonus," and "up to an additional $10,000 in temporary lodging expenses billed directly from the Chase Park Plaza" hotel.

On June 15, 2011, Paubel denied Ingram's appeal in a lengthy letter. Regarding the July 2006 payment issue, Paubel explained in detail why he rejected Ingram's four reasons for not treating the payment as excludable moving expenses. Noting that Broyles and Nouri averred that the payment "was compensation for the expenses associated with relocation" from California, and that Ingram's initial claim stated "that the amount was paid at least in part because there was no Company relocation or moving expense policy," Paubel concluded: "I find that the amount at issue was compensation for the expenses associated with relocation." This lawsuit followed.

C. Proceedings in the District Court. The district court initially denied cross-motions for summary judgment and invited the parties to supplement the administrative record with evidence relating to the discrepancy between the "sign on bonus" term used in the documents and Terminal's characterization of the payment as moving expenses. "Curiously," the court stated, "the claimed administrator, Kerry Paubel, has not submitted an affidavit regarding the reason for paying [Ingram] the $85,000." The court declined to resolve the standard of review issue because of genuine issues of disputed fact regarding "irregularities" alleged by Ingram. In response, Terminal filed an affidavit by Paubel further justifying his decision to classify the 2006 payment as reimbursement of moving expenses. Ingram filed a supplemental affidavit and additional evidence addressing these issues. The district court then granted summary judgment for Terminal. Concluding that abuse of discretion was the standard of review, the court focused "solely on the evidence available to the administrator at the time of the decision."

On appeal, Ingram argues that the district court's decision to reopen the record and admit Paubel's affidavit requires that we review the administrator's decision *de novo* because, in reviewing claims decisions by administrators with discretionary authority, "a reviewing court must focus on the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales." King v. Hartford Life & Accident Ins. Co., 414 F.3d 994, 999 (8th Cir. 2005) (en banc) (quotation omitted); compare Prezioso v. Prudential Ins. Co. of Am., 748 F.3d 797, 803 (8th Cir. 2014) (a district court may admit evidence in addition to that in the administrative record if "necessary for adequate *de novo* review of the fiduciary's decision"). This procedural contention is without merit.

Review of a plan administrator's discretionary decision must be limited to the administrative record, but additional evidence may be admitted "for the limited purpose of determining the proper standard of review." Waldoch v. Medtronic, Inc., 757 F.3d 822, 830 (8th Cir. 2014). If abuse of discretion is then determined to be the standard of review, review of the merits of the administrator's decision is limited to the administrative record. Id. at 833; see King, 414 F.3d at 999-1000. Here, the district court properly proceeded in that manner, inviting the parties to submit additional evidence addressing standard-of-review issues and then disregarding that evidence in reviewing the Plan administrator's decision for abuse of discretion. Likewise, on appeal, we consider the merits of the Plan administrator's decision on the administrative record, giving no effect to factual evidence initially submitted to the district court, including Paubel's affidavit and Ingram's supplemental affidavit.

D. The Merits. Under the abuse of discretion standard of review, "we must uphold [a plan administrator's] decision so long as it is based on a reasonable interpretation of the Plan and is supported by substantial evidence." Hampton v. Reliance Standard Life Ins. Co., 769 F.3d 597, 600 (8th Cir. 2014). A decision is reasonable "if a reasonable person *could* have reached a similar decision, given the

evidence before him, not that a reasonable person *would* have reached that decision." Midgett v. Wash. Grp. Int'l Long Term Disability Plan, 561 F.3d 887, 897 (8th Cir. 2009) (quotation omitted). We review administrator Paubel's final claims decision, not the initial denial letter, to ensure development of a complete record. See Khoury v. Grp. Health Plan, Inc., 615 F.3d 946, 952 (8th Cir. 2010). Where a plan fiduciary offered a reasonable interpretation of a disputed plan provision, "courts may not replace it with an interpretation of their own -- and therefore cannot disturb as an 'abuse of discretion' the challenged benefits determination." King, 414 F.3d at 999 (quotation and alteration omitted).

The July 2006 payment by employer Terminal to employee Ingram was reported to the IRS on Form W-2 as taxable income. The issue is whether the payment was excluded from the Average Monthly Earnings on which Ingram's retirement benefit was calculated many years later by the broad exclusion in § 2.14 of the Plan for taxable "reimbursements or other expense allowances and fringe benefits." Obviously, this exclusion does not turn on the federal tax laws -- § 2.14 excludes *taxable* fringe benefits reported as *taxable* income. Nor does the question turn on how the payment was classified in the employer's books and records at the time, absent evidence that the classification was intended to control future pension benefit decisions. Thus, while the term "sign on bonus" or "bonus" often denotes a payment that is part of an employee's salary or wages, that contemporaneous classification may be outweighed by extrinsic evidence that a particular bonus should be viewed under § 2.14 as an excluded expense allowance or fringe benefit, not as a qualifying portion of the employee's taxable earnings. For these reasons, we reject Ingram's contention that this issue may be resolved by the "plain meaning" of the words "moving expenses" and "reimbursement" in § 2.14, or by repeated use of the term "sign on bonus" in the contemporaneous 2006 documents.

The administrative record included statements and affidavits by the persons who negotiated the July 2006 payment, Ingram and Terminal President Billy Broyles.

This testimonial evidence presented Plan administrator Paubel with more consistency than disagreement. Ingram stated that he initially objected to Terminal's offer on two grounds, a substantial "cut in pay" and the absence of relocation or moving expenses. Broyles refused to offer more salary, said Terminal had no relocation expense policy, and asked what was needed to accept the job offer. Ingram replied that he needed $83,000 after taxes "to make the move financially feasible." Broyles then instructed Nouri to consult with Paubel and determine a reasonable amount "to compensate [Ingram] for the costs of moving."

The resulting payment of $142,737.20 ($85,000 after taxes) was no doubt intended to address both issues raised by Ingram, the cut in pay and the costs of relocating from California. The parties could have agreed to classify the payment, for retirement benefit purposes, as taxable salary, a taxable relocation expense allowance, or some combination of the two. Absent such an agreement, Plan administrator Paubel had to make the discretionary decision, some years later, whether to classify the payment as taxable salary or a taxable expense allowance under § 2.14. Like the district court, we conclude that either interpretation was reasonable. Therefore, substantial evidence supports the Plan administrator's decision and there was no abuse of discretion.

## III.  The Offset Issue.

Section 3.6 of the Plan defined Ingram's years of "Benefit Service" to include both the 4.5 years he worked at Terminal and the 35.5 years he worked at Union Pacific. Thus, his Gross Terminal Pension equaled 1.5% of Average Monthly Earnings times 40 years of service. However, under § 5.5(b) of the Plan, the pension paid by Terminal was reduced by the "retirement income payable" under his Union Pacific plan. In determining Ingram's monthly Single Life Annuity retirement benefit, Paubel interpreted the Plan as requiring an offset equal to the normal retirement benefits Ingram would have received under the Union Pacific plan, rather

than the lower benefits he was in fact receiving because he took early retirement.[4] Applying the abuse-of-discretion standard of review, the district court concluded that Paubel did not abuse his discretion as Plan administrator because he adopted a reasonable interpretation of the relevant Plan provisions. Ingram argues on appeal, as he did to the district court, that this decision was contrary to the Plan under any standard of review because the plain meaning of the Plan term "retirement income payable" is the benefits actually paid by Union Pacific.

The sentence at issue was part of the first paragraph of § 5.5(b): "The retirement income benefit *payable* under this Plan shall be offset by the amount of retirement income *payable* under any other defined benefit plan" (emphasis added). Citing dictionaries that define "payable" as "requiring payment on a certain date," Am. Heritage Dictionary (4th ed. 2000), Ingram argues that the plain meaning of payable in § 5.5(b) "requires resolution of the simple question: In January 2011 when Ingram retired from [Terminal], what was the 'amount of retirement income payable' from the UP Pension Plan? The answer is: Ingram's UP Pension Plan early retirement pension of $3,252.79 per month."

The problem with this plain language argument is that, in legal contexts, "payable" has a less definite meaning, which creates ambiguity -- a sum of money "that is to be paid. An amount may be payable without being due." Black's Law Dictionary (9th ed. 2009). In his letter explaining the denial of Ingram's appeal, Plan administrator Paubel expressly considered this ambiguity:

> The offset being applied to Mr. Ingram's monthly benefit is part of the calculation of the Normal Retirement Benefit [in Plan § 5.1(a)] -- the amount of the single life annuity payable at age 65. . . . Section 5.5

---

[4]Ingram receives $3,252.79 per month from Union Pacific's single life retirement benefit annuity. Had he waited to retire from Union Pacific until age 65, he would have received $4,280.38 per month in normal retirement benefits.

refers to the amount "payable," not the amount paid. The amount actually paid . . . is subject to variation depending on both the timing of the commencement of benefits and the form of benefit elected. I have interpreted the Plan to provide that the offset to the Normal Retirement Benefit required by Section 5.1 must be a normal retirement benefit, regardless of the time and form of the actual payment. Under this interpretation, a normal retirement benefit is offset by a normal retirement; there is an apples to apples correlation.

Under the interpretation you propose, the Normal Retirement Benefit under the Plan of two identically situated participants would vary simply because one participant chose to commence his benefit under another defined benefit plan earlier than the other. . . . Your interpretation produces this anomalous result because it offsets a normal retirement benefit by an early retirement benefit, an apples to oranges correlation.

On appeal, in addition to his plain meaning contention, Ingram notes that the second paragraph of § 5.5(b) provided that, if the other plan's benefit was paid in a form other than a monthly Single Life Annuity, such as a lump sum, the amount of the offset was expressly stated to be the monthly benefit that would have been payable under the other plan "commencing on the Participant's Normal Retirement Date." Ingram argues that the absence of this specific language in the first paragraph of § 5.5(b) means that Paubel's interpretation impermissibly changed that offset provision by adding the words, "retirement income *that would have been* payable *at normal retirement age.*"

Terminal responds that Ingram's interpretation impermissibly adds the words, "when the participant begins his benefit under this Plan," to the term "retirement income payable" in the first paragraph of § 5.5(b). Terminal argues that the second paragraph of § 5.5(b) supports Paubel's decision "because it again ties the offset to the amount payable at the Participant's Normal Retirement Date." Seeking to give linguistic legitimacy to Paubel's "apples to apples" analysis, Terminal further argues that Paubel reasonably interpreted the first paragraph of § 5.5(b) by giving the same

meaning -- normal retirement date -- to the word "payable" when it was used twice in the same sentence. On a more practical level, Terminal argues that Ingram seeks an improper subsidy from Terminal by having its Plan "make up the difference between" his reduced early retirement benefit and his normal retirement benefit under the Union Pacific plan. Ingram's reply brief responds that Paubel's decision sought to correct an oversight in the drafting of Terminal's 2002 Plan amendments "by twisting and ignoring Plan language to increase the offset."

The district court carefully considered these complex Plan provisions and concluded that the Plan administrator's interpretation was reasonable because it was not inconsistent with Plan language, was consistent with Plan goals and ERISA, and rationally construed the offset so that the Normal Retirement Benefit under the Plan does not vary because of the form of payment chosen under another plan. After careful review applying the deferential abuse of discretion standard, we agree. Ingram's textual arguments have some force, but they do not persuade us that the term "retirement income payable" is susceptible of only one reasonable interpretation. Paubel's interpretation of § 5.5(b) was carefully explained and was not unreasonable textually. It also reasonably avoided benefit disparities between similarly situated retiring participants by using normal retirement age offset criteria in determining Ingram's normal retirement age monthly benefit from Terminal. Under the abuse-of-discretion standard, it is irrelevant that we might have construed § 5.5(b) differently, as the court did in Cocker v. Terminal R.R. Ass'n of St. Louis Pension Plan for Nonschedule Emps., 2015 U.S. Dist. LEXIS 75116, No. 12-1239 (S.D. Ill.), appeal docketed, No. 15-2690 (7th Cir. Aug. 11, 2015). We respectfully disagree with that district court's decision.

For the foregoing reasons, the judgment of the district court is affirmed.

_____