# United States Court of Appeals

### For the Eighth Circuit

_____

No. 21-3063

_____

Melissa A. McIntyre

*Plaintiff - Appellee*

v.

Reliance Standard Life Insurance Company

*Defendant - Appellant*

_____

No. 22-1296

_____

Melissa A. McIntyre

*Plaintiff - Appellee*

v.

Reliance Standard Life Insurance Company

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: March 15, 2023
Filed: July 21, 2023

_____

Before COLLOTON, MELLOY, and GRUENDER, Circuit Judges.
_____

GRUENDER, Circuit Judge.

Melissa McIntyre sued Reliance Standard Life Insurance Company under 29 U.S.C. § 1132(a)(1)(B), seeking to recover long-term disability benefits. The district court granted McIntyre's motion for summary judgment and denied Reliance's cross-motion. Reliance appeals, and we reverse.

**I.**

McIntyre was a nurse for the Mayo Clinic Health System from 2003 until she resigned in July 2011. She stopped working for Mayo Clinic due to symptoms of Charcot-Marie-Tooth disease ("CMT"). CMT is a genetic, degenerative neurological disease that damages peripheral nerves.

McIntyre participated in Mayo Clinic's long-term disability ("LTD") plan, which is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Reliance funded the plan and served as the plan administrator and claims-review fiduciary. The plan reserved to Reliance the right to have claimants undergo an independent medical examination ("IME").

Soon after resigning, McIntyre applied for LTD benefits. The plan provides LTD benefits when, among other requirements, an insured is "Totally Disabled." As defined by the plan, an insured is "Totally Disabled" if he or she "cannot perform the material duties of his/her Regular Occupation," that is, "the occupation the Insured is routinely performing when Total Disability begins." That definition of disability applies for twenty-four months. Thereafter, a claimant is "Totally Disabled" only if the insured "cannot perform the material duties of Any Occupation," that is, "an occupation normally performed in the national economy for which an Insured is reasonably suited based on his/her education, training or

experience." The plan also makes clear that those who can work only part time or who can perform only part of the duties of a qualifying occupation are nonetheless "Totally Disabled."

Reliance accepted McIntyre's claim for LTD benefits in October 2011 and continued to pay benefits after October 2013 when the narrower "Total Disability" definition took effect. Along the way, Reliance periodically reviewed McIntyre's file and assessed her capacity to work. In July 2013, Reliance requested that McIntyre complete an activities-of-daily-living questionnaire. In response, McIntyre explained that she prepared meals, dressed and groomed herself, drove about three to four miles a week, and performed housework including laundry and gardening. McIntyre also listed training dogs as a hobby, although she explained that she sometimes missed dog shows and related classes due to pain. Later in 2013, one of Reliance's nurses, Heather DiFalco, reviewed McIntyre's file. DiFalco concluded that McIntyre could not work due to CMT but noted that McIntyre appeared to be "functional at times at home as demonstrated by her ability to breed dogs/show dogs, and work part-time as a respite care provider."

In February 2014, Reliance obtained a research report about McIntytre's online activities from Marshall Investigative Group. The report focused on McIntyre's dog breeding and training. It noted that McIntyre was an obedience instructor for the Key City Kennel Club and that she operated a dog-breeding service, Vom Wenner Haus. The Vom Wenner Haus website contained information about a litter of German Shepherd puppies that McIntyre bred in 2013. McIntyre's Facebook page also displayed many posts about her dog breeding and showing activities.

Reliance also reviewed McIntyre's medical records. McIntyre's primary physician for her CMT was Dr. Vanessa Tseng, a Mayo Clinic neurologist. McIntyre visited Dr. Tseng in July 2014, complaining of increasing pain in her feet, fatigue, and declining left-hand function. Dr. Tseng conducted a physical examination. She noted that McIntyre "has some more weakness of the left upper

extremity and the hamstrings at today's visit but very mild." Dr. Tseng suggested that McIntyre do resistance-band strength exercises and raised her dosage of a restless-leg-syndrome medication. Nonetheless, she also commented that McIntyre "continues to be very active raising service dogs and swimming."

DiFalco reviewed McIntyre's file again in February 2015. DiFalco again concluded that McIntyre was unable to work due to her CMT symptoms yet also noted McIntyre's "dog breeding/showing activities," stating that it was unclear whether these were occurring on a consistent basis.

Following DiFalco's second review, Reliance obtained two additional reports from Marshall Group, one in March 2015 and one in July of that year. The first report documented McIntyre's online activities. The report contained several new Facebook posts about McIntyre's dog breeding and showing activities. Some posts showed recently bred puppies and advertised an upcoming litter. Other posts highlighted McIntyre's results at dog-show competitions.

Another nurse, Robin Bickel, reviewed McIntyre's file and this March report and determined that it did not contradict DiFalco's conclusion that McIntyre remained symptomatic from CMT and lacked the ability to work. The second Marshall Group report documented in-person surveillance of McIntyre over three days in June 2015. On one day, McIntyre drove to the Key City Kennel Club, stayed there for several hours, and taught a class to ten to fifteen people. On another, McIntyre drove to the Key City Kennel Club and stayed there for about three hours, then drove to a mall and a garden center, making purchases at each stop. When McIntyre returned home, she arranged plants and flowers and pulled weeds in her garden for about ten minutes. McIntyre was out of her house for about five hours and fifteen minutes that day. Throughout the surveillance, an investigator observed that McIntyre walked with a "slight limp." Otherwise, the investigator never observed her struggling with physical tasks (like opening the rear door of her car, making purchases, pulling weeds, or arranging flowers).

McIntyre saw Dr. Tseng again in July 2015, and Reliance received updated records from the visit. Dr. Tseng conducted another physical examination, which "reveal[ed] trace weakness of left extensor carpi radialis, extensor digitorum communis, and the interossei muscles . . . in the lower extremities." Dr. Tseng also noted that McIntyre's cognitive functions were "intact" and that she had "[n]o power of the dorsiflexors, invertors, or evertors" and some weakness in the quadriceps and hamstrings. Dr. Tseng concluded that "I will continue her on her medications and have also asked her to start an antioxidant diet, like the Mediterranean diet."

A third Reliance nurse, Ingrid Bergstrom, reviewed McIntyre's file in December 2015. Unlike DiFalco and Bickel, Bergstrom concluded that McIntyre could do full-time sedentary work. Bergstrom and a vocational expert, Carol Vroman, conducted an occupational analysis and determined that several sedentary jobs were commensurate with McIntyre's education level and work history. These included office nurse, cardiac-monitor technician, and hospital-admitting clerk.

Reliance therefore terminated McIntyre's LTD benefits in a February 2016 letter. The letter described in detail McIntyre's self-reported functionality within her home, her medical records, including those from Dr. Tseng's 2014 and 2015 examinations, as well as the Marshall Group's surveillance. The letter explained the decision to deny benefits as reflecting "the totality of the information we have on file."

McIntyre appealed to Reliance on May 31, 2016. In addition to her own statement, she submitted letters from her friends and family, an employment evaluation from a therapist, and a letter from Dr. Tseng. Dr. Tseng, for the first time in any record shared with Reliance, opined that McIntyre's CMT affected her mental abilities. Specifically, Dr. Tseng said that pain and fatigue inhibited McIntyre's ability to focus. Dr. Tseng also said that McIntyre could not stay in one position or perform one task for more than thirty minutes. Dr. Tseng had not seen McIntyre since July 2015.

On June 22, 2016, twenty-two days after receiving McIntyre's appeal, Reliance requested updated medical records from McIntyre's providers. Reliance confirmed that it had received the records on August 25 and notified McIntyre that it would schedule an IME. The next day, Reliance (through a third-party service) scheduled an IME for September 20, 2016. However, the day before the exam was to take place, the doctor cancelled due to a conflict of interest. On September 30, Reliance notified McIntyre that it had rescheduled the IME for October 22 with Dr. Khalafalla Bushara in Alexandria, Minnesota. On October 10, McIntyre notified Reliance that she objected to the IME falling on a Saturday and to its location, three hours from her house. Reliance again asked its third-party service to reschedule the IME, but the service provider lost track of Reliance's request. On November 10, Reliance succeeded in rescheduling an IME with Dr. Bushara for December 3.

Dr. Bushara examined McIntyre. He, like Dr. Tseng in July 2015, did not note any cognitive issues. He, like Dr. Tseng, observed McIntyre's lower-extremity weakness but also noted normal tone and muscle in McIntyre's upper-body. Dr. Bushara concluded that McIntyre's loss of balance, lower-body weakness, and use of the restless-leg-syndrome medication likely contributed to her complaints of fatigue. Nevertheless, Dr. Bushara also concluded that McIntyre could work full-time sedentary jobs, which he described as "office work with no tasks that require balance."

On December 22, Reliance denied McIntyre's appeal. By waiting until December 22 to decide her appeal, Reliance exceeded the regulatory timetable governing administrative appeals of benefits denials. A plan administrator must respond to the appeal of an adverse benefits determination within forty-five days of receipt of the appeal,[1] although that period is tolled while the administrator seeks

---

[1]A plan administrator may take an additional forty-five days to decide an appeal if the plan administrator "determines that special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require an extension of time for processing the claim" before the initial forty-five-day period

additional medical records. 29 C.F.R. § 2560.503-1(i)(1)(i), (3)(i), (4).[2] Here, 205 days passed between McIntyre filing her appeal and Reliance's decision. If one accounts for medical-records tolling, then 149 days passed. In its denial letter, Reliance discussed Dr. Bushara's conclusions. Reliance acknowledged Dr. Tseng's opinion that McIntyre could not focus on one task for more than thirty minutes at a time. But according to Reliance, the various jobs that McIntyre could perform allowed for breaks.

McIntyre sued Reliance under 29 U.S.C. § 1132(a)(1)(B). Both parties moved for summary judgment. Reviewing Reliance's decision *de novo*, the district court reversed Reliance's denial of benefits, and Reliance appealed. *See McIntyre v. Reliance Standard Life Ins.*, 972 F.3d 955, 957 (8th Cir. 2020) (*McIntyre I*). We vacated the decision and remanded, rejecting the district court's application of *de novo* review even when procedural irregularities, like decisional delay, occurred. *Id.* at 963-65. Rather than *de novo* review, the district court should have applied "sliding scale" abuse-of-discretion review as articulated in *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160-62 (8th Cir. 1998), *abrogated in part by Metro. Life Ins. v. Glenn*, 554 U.S. 105, 115-16 (2008), under which a procedural irregularity is one of many factors that a court should evaluate in determining whether there was an abuse of discretion. *Id.*

On remand, the district court again awarded McIntyre LTD benefits. The court found that Reliance's delay in deciding McIntyre's appeal was an "egregious procedural irregularity [that] violated ERISA's clear statutory mandates." The court described the delay as "enabl[ing] Reliance to secure the single piece of evidence—

_____

expires. 29 C.F.R. § 2560.503-1(i)(1)(i), (3)(i). Reliance did not notify McIntyre of its intent to take an extension during the initial forty-five days.

[2]The regulations also provide a remedy when a plan administrator fails to meet its deadline, namely that the claimant "is deemed to have exhausted the administrative remedies available under the plan" and can bring immediately an action in federal court challenging the benefits denial. 29 C.F.R. § 2560.503-1(l).

Dr. Bushara's IME report—that could plausibly justify its final denial," and the court weighed the delay heavily in its abuse-of-discretion analysis. The court also found that Reliance had a history of biased claims administration, giving that finding significant weight in its analysis of Reliance's conflict of interest, especially "when viewed in the context of [the] egregious procedural irregularities." Lastly, the court found that Reliance's benefits determination was not supported by substantial evidence. The court cited "ample evidence from medical professionals" indicating that McIntyre's CMT was worsening and that she was unable to work full time due to her pain, fatigue, and inability to perform a task for more than thirty minutes. Reliance again appeals, arguing that substantial evidence supports its decision and that neither decisional delay nor a conflict of interest show an abuse of discretion.

## II.

We review the district court's grant of summary judgment *de novo*, *Whitley v. Standard Ins.*, 815 F.3d 1134, 1136 (8th Cir. 2016), and Reliance's decision for an abuse of discretion, *McIntyre I*, 972 F.3d at 959. Under abuse-of-discretion review, we reverse the plan administrator's decision only if it was arbitrary and capricious, meaning it was unreasonable or unsupported by substantial evidence. *Miller v. Hartford Life & Accident Ins.*, 944 F.3d 1006, 1010-11 (8th Cir. 2019); *Roebuck v. USAble Life*, 992 F.3d 732, 740 (8th Cir. 2021). "Under the abuse of discretion standard of review, we do not substitute our own weighing of the evidence for that of the administrator." *Gerhardt v. Liberty Life Assur. Co. of Bos.*, 736 F.3d 777, 780 (8th Cir. 2013) (internal quotation marks omitted). "A decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Ingram v. Terminal R.R. Ass'n of St. Louis Pension Plan for Nonschedule Emps.*, 812 F.3d 628, 634 (8th Cir. 2016). "Only when the evidence relied on is overwhelmed by contrary evidence may the court find an abuse of discretion." *Whitley*, 815 F.3d at 1142 (internal quotation marks omitted). Decisional delays and conflicts of interest do not change the standard of review, but we consider them when determining whether the plan administrator abused its discretion. *Glenn*, 554 U.S. at 116; *McIntyre I*, 972

F.3d at 963. We consider first whether substantial evidence supports Reliance's decision and then evaluate whether the procedural irregularities at issue in this case suggest an abuse of discretion.

## A.

Here, Reliance's decision to deny McIntyre's claim and its conclusion that she could work a sedentary full-time job were supported by substantial evidence. McIntyre reported to Reliance that she could independently do household chores and personal tasks. She taught classes at the Key City Kennel Club, bred German Shepherds, and entered her dogs into competitions. When surveilled, McIntyre was able to walk—albeit with a slight limp—and manipulate objects with her hands. On one day, McIntyre was observed at the Key City Kennel Club for about three hours and then seen shopping for two hours. Although McIntyre was not out of her house for a full eight hours, her activities that day required more movement than a sedentary office job does. Dr. Tseng's office notes from her 2014 and 2015 examinations of McIntyre indicated that McIntyre's leg-muscle and upper-extremity weakness was limited. Dr. Tseng did not order treatment more significant than the use of pain medications and dietary interventions to reduce inflammation and resistance-band exercises to increase leg strength.

And Dr. Bushara's conclusion that McIntyre could perform sedentary full-time work is consistent with the other evidence in the record. Dr. Bushara indicated that McIntyre's pain and fatigue were likely caused by her "loss of balance, lower extremity weakness, and sensory loss," as well as her use of pain-relief and restless-leg-syndrome medication. In concluding that McIntyre could work full time in a sedentary position, Dr. Bushara made plain that his recommendation only extended to "office work with no tasks that require balance." Essentially, Dr. Bushara found that movement is an important trigger of McIntyre's pain and fatigue symptoms and that a sedentary job that did not require balance would not aggravate those symptoms. Thus, we conclude that Dr. Bushara's opinion, Dr. Tseng's pre-denial office notes, the investigative surveillance, and McIntyre's own reports constitute

-9-

substantial evidence supporting Reliance's denial of LTD benefits. *Cf. Whitley*, 815 F.3d at 1141 (affirming an administrator's denial of benefits when an independent medical examiner opined that degenerative disc disease "do[es] not preclude the standing and walking required of an ER physician"); *Cooper v. Metro. Life Ins.*, 862 F.3d 654, 660, 662 (8th Cir. 2017) (affirming a plan administrator's denial of benefits to a claimant when the record was devoid of objective medical evidence substantiating the claimant's position that her fatigue was disabling).

To be sure, the record contains evidence to the contrary. For instance, the dissent keys in on Dr. Tseng's post-benefits-denial conclusion that McIntyre could not work full time. And early on, some of Reliance's nurse reviewers reached the same conclusion. Medical examinations of McIntyre, including Dr. Bushara's, confirmed McIntyre's lower-extremity weakness, and she consistently reported experiencing pain and fatigue because of her symptoms, which made household chores difficult and required her to limit her dog training and breeding activities. Also, Drs. Tseng and Bushara agreed that, as a progressive neurological disease, McIntyre's CMT may worsen over time. But this evidence does not negate the substantial evidence supporting Reliance's decision. *See Ingram*, 812 F.3d at 634 ("A decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." (internal quotation marks omitted)).

McIntyre's other arguments are unavailing. Specifically, McIntyre argues that: (1) there was no evidence of improvement in her degenerative medical condition to explain Reliance's decision to terminate, (2) Reliance relied on her dog-training activities in its decision to terminate despite knowing of these activities when paying benefits, (3) Dr. Bushara's opinion did not logically follow from his analysis, (4) Reliance withheld relevant evidence from its reviewers, (5) Reliance misrepresented facts in the record, and (6) Reliance relied on comments in the medical record taken out of context.

We address each argument in turn. First, Reliance never claimed that McIntyre's medical condition improved. Rather, it amassed evidence over time about the extent and nature of her pain, fatigue, and functional capacity, which are all difficult to evaluate, and made a decision based on "a totality of information." Second, and relatedly, McIntyre's dog-training activities were just one kind of evidence supporting Reliance's determination, and Reliance learned more about the extent and nature of those activities over time. Third, Dr. Bushara's opinion that McIntyre could work a sedentary job was logical because, as discussed above, Dr. Bushara indicated that loss of balance and lower-extremity weakness were the source of McIntyre's pain and fatigue.

Unlike the dissent, we see no illogic between Dr. Bushara's opinion that McIntyre could work a full-time sedentary job and his conclusion that her CMT will cause lower-extremity issues or that McIntyre could complete certain upper-extremity movements—like grasping, reaching, and fine manipulation—only "frequently." These limitations might restrict the sorts of sedentary jobs McIntyre could perform. But it does not follow that she cannot perform any sedentary jobs or that no such jobs exist. Indeed, Vroman's occupational analysis took into account these limitations when she proposed jobs compatible with them.

Fourth, although Reliance did not provide Dr. Bushara with Dr. Tseng's office notes from four of McIntyre's seven visits, McIntyre does not claim that these notes would have changed Dr. Bushara's analysis. Importantly, Reliance provided Dr. Bushara with Dr. Tseng's 2016 letter stating that McIntyre could not work full time. McIntyre also emphasizes that Reliance did not provide its vocational expert with the opinions of its reviewing nurses that McIntyre could not work. That argument, however, reflects a misunderstanding of the role the vocational expert played here, which was to identify sedentary jobs consistent with McIntyre's education and experience. Reliance did not rely on the vocational expert for a determination of McIntyre's capacity to work, so those records were irrelevant to the expert's analysis. Fifth, the misrepresentations that McIntyre identifies do not affect the overall weight of the evidence. Most notably, McIntyre emphasizes that Reliance's

initial denial letter said she was "walking normally" when she in fact walked with a slight limp. That mistake does not undermine the conclusion Reliance drew from the surveillance evidence. Sixth, Reliance's initial denial letter and the appeal denial letter contained comprehensive reviews of the medical record.

B.

We lastly consider whether the decisional delay in this case or Reliance's evaluator/payor conflict of interest should lead us to conclude that Reliance abused its discretion. Under the circumstances, neither are due much weight in our analysis.

1.

Here, a procedural irregularity existed because Reliance failed to timely decide McIntyre's appeal. We weigh heavily any procedural irregularity that leaves us "with serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." *Buttram v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 76 F.3d 896, 900 (8th Cir. 1996); *see also Woo*, 144 F.3d at 1161 (explaining that a procedural irregularity must have "some connection to the substantive decision reached" to trigger more exacting scrutiny of the administrator's determination). By contrast, "[m]inor procedural defects . . . do not carry significant weight." *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 830 (8th Cir. 2014); *see also Trs. of Electricians' Salary Deferral Plan v. Wright*, 688 F.3d 922, 927 (8th Cir. 2012) (declining to apply a heightened standard of review when an administrator procedurally erred by failing to notify a claimant of record-access rights in part because the claimant failed to demonstrate that the error "was connected to [the administrator's] ultimate decision").

Reliance's improper delay does not, of itself, mean that the claims-review process was unfair or biased against McIntyre. *See* 29 C.F.R. § 2560.503-1(i)(1)(i). The record indicates that, after accounting for medical-records tolling, Reliance initially scheduled an IME within forty-five days, but the doctor cancelled for

reasons outside of Reliance's control. McIntyre then objected to the next scheduled IME, but Reliance (and its third-party scheduling provider) made logistical mistakes that further delayed the IME. As we said in *McIntyre I*, the delay was "caused by both McIntyre and Reliance," but there is no evidence (and McIntyre does not claim) that Reliance's role in the delay stems from an attempt to find a sympathetic doctor, pressure McIntyre to drop her appeal, or otherwise rig the appeals process against her. *See* 972 F.3d at 958.

McIntyre nevertheless argues that Reliance's delay is due significant weight because Dr. Bushara's IME would not have been available had Reliance decided the appeal within the required forty-five days. But Reliance had a good reason to seek more medical evidence when considering McIntyre's appeal. Reliance based its initial decision to stop paying benefits, in part, on McIntyre's treatment records with Dr. Tseng from 2015. However, Dr. Tseng's letter submitted in support of McIntyre's appeal painted a much graver picture than Dr. Tseng's 2015 examination notes. That letter came a year after McIntyre had last seen Dr. Tseng. We see nothing nefarious in Reliance's decision to request an IME.

McIntyre also argues that the regulatory timelines are of paramount importance for disabled claimants who rely on benefits to make ends meet. We acknowledge that an administrator's failure to meet its adjudicatory deadlines may harm a claimant. But procedural irregularities are given significant weight in the abuse-of-discretion analysis when they indicate that "the result reached was the product of an arbitrary decision." *See Buttram*, 76 F.3d at 900. And in this case, Reliance's delay, while lengthy, does not indicate arbitrary decision-making. Thus, Reliance's failure timely to determine McIntyre's appeal carries little weight in our abuse-of-discretion analysis.

2.

In this case, Reliance also operated under an evaluator/payor conflict of interest. Reliance argues that the district court erroneously weighed heavily this

-13-

conflict by relying on other judicial decisions overruling Reliance's benefits determinations. We agree with Reliance that its conflict of interest should not receive significant weight.

"[W]hen judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one." *Glenn*, 554 U.S. at 117. The weight given to the administrator's conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Id.* By contrast, the conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce bias and promote accuracy, for example, by walling off claims administrators from those interested in firm finances." *Id.* And where the record says little about either the administrator's bias or efforts to ensure accuracy, the reviewing court may give the conflict "some degree" of weight while "focus[ing] more heavily on other factors." *See id.* at 118; *see also Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 954 (8th Cir. 2010) (explaining that when a claimant is "unable to state how the existence of a conflict of interest impacted the claims decision," a court must give the conflict "some weight," but it should not be "determinative").

The district court gave weight to what it described as "the well-documented irregularities and judicial critiques of Reliance's claims review process" and the "documented history of [Reliance's] arbitrary claims denials." In support of that assertion, the court cited three cases from our sister circuits and one district court case reversing Reliance's benefits determinations. Reliance argues that, in so doing, the district court impermissibly relied on hearsay evidence. *See United States v. Jeanpierre*, 636 F.3d 416, 423 (8th Cir. 2011) (noting that a majority of our sister circuits have held that "judicial findings of fact are hearsay, inadmissible to prove the truth of the findings unless a specific hearsay exception exists"). By contrast, McIntyre argues that *Glenn*'s reference to "cases where an insurance company administrator has a history of biased claims administration" specifically

contemplated that courts would look to past judicial decisions when considering bias. *See Glenn*, 554 U.S. at 117.

Because the cited cases do not "suggest a higher likelihood that [Reliance's conflict of interest] affected the benefits decision," we need not decide whether the district court properly considered past judicial decisions as evidence. *Id.* First, the three appellate cases offer only fact-specific, non-generalizable critiques of Reliance's benefits decisions. *See Okuno v. Reliance Standard Life Ins.*, 836 F.3d 600, 612 (6th Cir. 2016) (reversing a denial of benefits because Reliance's staff physicians did not sufficiently account for findings of the treating physician); *George v. Reliance Standard Life Ins.*, 776 F.3d 349, 355 (5th Cir. 2015) (reversing a denial of benefits due to a lack of record evidence about the income a claimant could earn from a sedentary occupation); *Hoff v. Reliance Standard Life Ins.*, 160 F. App'x 652, 654 (9th Cir. 2005) (upholding Reliance's denial of benefits to one claimant and reversing as to another with little comment).

As for the one district court case on which McIntyre relies for its finding that "the judicial record establishes an unmitigated pattern of arbitrary and wrongful behavior by Reliance," there, the district court explained that it had found, *sua sponte*, sixty cases reversing Reliance benefits decisions over the course of twenty-one years. *Nichols v. Reliance Standard Life Ins.*, No. 3:17-cv-42-CWR-FKB, 2018 WL 3213618, at *6, *9 (S.D. Miss. June 29, 2018), *rev'd*, 924 F.3d 802 (5th Cir. 2019). The Fifth Circuit reversed, explaining that the extensive list of case citations did not constitute "evidence that the conflict impacted the administrator's decision" in the claimant's particular case. 924 F.3d at 814. In any event, we do not find the district court's decision persuasive because it did not cite any case identifying specific policies or practices that caused Reliance arbitrarily to deny claims. Nor did the decision provide data demonstrating a systemic problem.

In sum, the cases cited do not demonstrate that Reliance has a history of biased claims administration. Nor do they show some other systemic flaw in its claims-review process that affected Reliance's review of McIntyre's claim. *See Glenn*, 554

-15-

U.S. at 117. On the other hand, Reliance does not argue that it maintained structural separations to minimize its conflict of interest. Therefore, the conflict of interest in this case deserves "some weight," *see Khoury*, 615 F.3d at 954, but we conclude that it does not indicate that Reliance abused its discretion.

### III.

Substantial evidence supports Reliance's decision, and neither the decisional delay in this case nor the purported conflict of interest leads us to conclude that Reliance abused its discretion. Thus, we reverse the district court's grant of summary judgment to McIntyre and denial of summary judgment to Reliance. We likewise vacate the district court's fee award and remand the case for entry of judgment in favor of Reliance.

MELLOY, Circuit Judge, dissenting.

Because I agree with the district court's finding that Reliance's decision to terminate benefits was not based on substantial evidence, I would affirm. This court's review of a plan administrator's decision to terminate benefits is "deferential, [but it] is not tantamount to rubber-stamping the result. . . . [We] require[] that [the decision] be supported by substantial evidence that is assessed by its quantity and quality." *Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005).

I first find it necessary to address procedural issues. When a plan administrator commits procedural irregularities in deciding a claim, the reviewing court should consider the procedural irregularities as a factor in the abuse-of-discretion analysis. *McIntyre v. Reliance Standard Life Ins. Co.*, 972 F.3d 955, 965 (8th Cir. 2020). Reliance committed procedural irregularities when it took longer than permitted by law to respond to McIntyre's appeal. A plan administrator is required to inform the claimant about the result of an appeal within 45 days of receiving the appeal. 29 C.F.R. §§ 2560.503-1(i)(1)(i) and (i)(3)(i). "If the plan administrator determines that an extension of time for processing is required, written notice of the extension shall

-16-

be furnished to the claimant prior to the termination of the initial [45]-day period." *Id.* The regulation specifies: "In no event shall such extension exceed a period of [45] days from the end of the initial period." *Id.*

On May 31, 2016, McIntyre filed her appeal with Reliance. On August 25, Reliance indicated it had received all medical records and informed McIntyre "that because statutory and internal guidelines set strict deadlines for completion of an appeal review, our request for an [independent medical examination] will toll the statuary [sic] time frames for reaching an appeal determination, from the time of our request until such time as we receive the independent physician's report." On October 20, and again on October 25, Reliance wrote to McIntyre stating, "Please allow this letter to serve as notice of our intention to take beyond 45 days to make a final decision on your appeal[.]" On December 21, Reliance denied McIntyre's appeal.

In reviewing the appeal, Reliance thus misrepresented governing law and committed two procedural errors. Reliance inaccurately informed McIntyre that the time limitation was tolled while Reliance was looking for an independent medical examiner. There is no authority for such a statement. Additionally, Reliance notified McIntyre that the appeal would take longer than 45 days after the initial 45-day period had elapsed. Finally, Reliance took more than an additional 45 days after notifying McIntyre that more time was needed. In total, Reliance took over 200 days to respond to McIntyre's appeal, with over 115 of those days passing after Reliance had received all requested records from McIntyre.

Reliance correctly points out it did not have control over all the factors resulting in the delay. However, Reliance showed either a misunderstanding of the rules or a blatant disregard of the rules in failing to give proper notices and adhere to clear time limitations. In *McIntyre I*, we made clear that delays in an appeal do not result in de novo review. However, we also made clear that procedural irregularities must be considered when conducting the abuse-of-discretion analysis.

Applying an abuse-of-discretion analysis, I conclude that the record does not provide substantial evidence to support Reliance's decision—regardless of how the procedural irregularity may factor into the analysis. McIntyre's treating physician provided strong evidence showing McIntyre could not work full time because her condition causes fatigue which requires frequent breaks. Nothing Reliance discusses in their letter denying benefits—including Dr. Bushara's report, Ms. Vroman's report, or the surveillance report—properly rebuts the treating physician's finding. Additionally, Reliance relies on reports containing conclusions that do not logically follow from the report's findings.

Neither Dr. Bushara's report nor Reliance's denial letter properly rebut the treating physician's finding that McIntyre cannot stay in one position or perform one task for greater than 30 minutes at a time. While plan administrators are permitted to give more weight to their own experts' reports, plan administrators are not permitted to "ignore[] relevant evidence." *Willcox v. Liberty Life Assurance. Co. of Boston*, 552 F.3d 693, 701 (8th Cir. 2009). In the letter denying the appeal, Reliance wrote:

> Although her neurologist, Dr. Tseng indicated that your client cannot stay in one position or perform one task for greater than thirty minutes, the occupations that have been identified above, allow for "breaks". In addition, within the employment evaluation, Ms. Schrot indicated that your client experienced, "fatigue, pain, neuropathy in the hands and feet, impact of concentration", however, Dr. Bushara noted that during the examination, your client showed normal tone and bulk in her upper extremity and, "the power was 5/5 on the right side and 5/5 on the left side".

Reliance's assertion that a job would allow for "breaks"—without addressing the frequency or the duration of such breaks—does not adequately address the treating physicians concerns that McIntyre cannot work for more than 30 minutes at a time. Additionally, the assertion that McIntyre had "normal tone and bulk in the upper extremity" does not address concerns about fatigue, pain, or concentration.

-18-

The surveillance report also fails to adequately address the impact of McIntyre's fatigue on her ability to work. Reliance chose to highlight parts of the report which indicate McIntyre was able to participate in dog breeding activities, shop, garden, and complete daily activities. However, the surveillance report noted McIntyre walked with a limp while completing these activities. The surveillance report indicated that McIntyre was active or out of her home for a maximum of five and a half hours a day. Additionally, McIntyre was regularly switching physical positions while out of her house—something her treating physician indicated was necessary to ease her pain but would be unavailable when working a sedentary job. These findings do not show McIntyre can work a full-time job.

The majority relies on Dr. Bushara's assertion that balance issues, which would be eliminated in a sedentary job, are the cause of fatigue. However, Dr. Bushara noted that McIntyre's fatigue is caused by, in addition to loss of balance, "lower extremity weakness, and sensory loss as well as medications for restless legs syndrome (Neurontin)." These other causes of fatigue are not eliminated by a sedentary job. Reliance's use of unresponsive statements to rebut McIntyre's evidence is tantamount to "simply ignor[ing] relevant evidence or 'arbitrarily refus[ing] to credit a claimant's reliable evidence.'" *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 833 (8th Cir. 2014) (citation omitted).

Additionally, Dr. Bushara's and Ms. Vroman's conclusions do not follow logically from their report's findings. *Willcox*, 552 F.3d at 700–01 ("Liberty Life was entitled to seek and obtain a professional peer review opinion . . . , but it was 'not free to accept this report without considering whether its conclusions follow logically from the underlying medical evidence.'" (citation omitted)). Dr. Bushara noted that "Ms. McIntyre is capable of working full time in a sedentary position as of January 18, 2016." This finding is difficult to reconcile with Dr. Bushara's own conclusion that McIntyre's condition will cause "profound weakness, sensory loss and wasting of the lower extremity muscles and loss of balance[]" as well as a finding that "there are medical data to substantiate the subjective complaints [of fatigue] as of January 18, 2016."

Further, Dr. Bushara completed a "Physical Capacities Questionnaire" which asked the doctor to indicate "the patient's ability to perform [certain] activities on a regular basis in an 8-hour workday." Dr. Bushara's questionnaire responses indicated McIntyre could only complete several upper extremity movements "frequently"—meaning 34–66% of the time. The limited upper extremity movements included: simple grasping, reaching about mid chest, reaching at waist/desk level, fine manipulation, and feeling/tactile sensation. Dr. Bushara's report does not discuss how this limited motor function in the upper extremities may limit an individual's ability to perform a sedentary job.

Ms. Vroman's Residual Employability Analysis also fails to address the implications of Dr. Bushara's Physical Capacities Questionnaire. Ms. Vroman recommends several jobs, all of which require full-time work at a computer. Without further discussion from Reliance, or Reliance's experts, the finding that McIntyre can work full time at a computer does not "logically follow" from a report which found McIntyre did not have the ability to continuously utilize fine motor skills, reach at desk level, or use other upper body mobility on a regular basis in an 8-hour workday.

Even if this case was close, the procedural irregularities on top of the weak evidence makes it clear Reliance abused its discretion in denying McIntyre's appeal.

_____